Gregory David BRYANT-BRUCE,
et al., Plaintiffs,

v.

VANDERBILT UNIVERSITY,
INC., et al., Defendants.

No. 3-96-0153.

United States District Court,
M.D. Tennessee,
Nashville Division.

July 3, 1997.

Alfred Russell Willis, William R. Willis, Jr., Jeffrey G. Rappuhn, Willis & Knight, Nashville, TN, Brian T. Dunn, Carl E. Douglas, Johnnie L. Cochran, Jr., Law Offices Of Johnnie L. Cochran, Jr., Los Angeles, CA, John C. Mayoue, Warner, Mayoue & Bates, P.C., Atlanta, GA, for Gregory David Bryant–Bruce, Jr., Cheryl Denise Bryant–Bruce and Gregory David Bryant–Bruce, Sr.

H. Lee Barfield, II, Emmitt Clifton Knowles, Steven E. Anderson, Donald L. Zachary, Bass, Berry & Sims, Nashville, TN, for Vanderbilt University, Inc., Dr. Nikki Oquist, Dr. David Johnson, Dr. Noel Tulipan, Dr. Peter D'Sousa, Dr. Garrett, Dr. Ghishan, Dr. Wallace, Dr. McGaha, Dr. Gigante, Dr. Brad Bullock, Dr. Timothy Reilly.

Dianne Stamey Dycus, Office of the Atty. Gen., Nashville, TN, for Tennessee Dept. of Human Services, Charles Wilson, Helen Allen, Steve Allen, Janice Robles and Brenda Stevenson.

Louis Gino Marchetti, Jr., Taylor, Philbin, Pigue, Marchetti & Long, Nashville, TN, for Nancy Salyer and Catholic Social Services.

Joseph A. Woodruff, Waller, Lansden, Dortch & Davis, Nashville, TN, for Tennessee Pediatric Society.

### MEMORANDUM

ECHOLS, District Judge.

Plaintiffs filed this Complaint pursuant to 42 U.S.C. § 1983, § 1985 and § 1986 alleging that Defendants violated their constitutional rights under the First, Fourth, Fifth, Eighth, Thirteenth and Fourteenth Amendments of the United States Constitution (Counts I, II & III). Plaintiffs also allege that they are entitled to damages under the following state law theories: professional negligence (Count IV), negligence (Count V), malicious prosecution (Count VI), abuse of legal process (Count VII), false imprisonment (Count VIII), invasion of privacy (Count IX), defamation of character (Count X), outrageous conduct (Count XI), and loss of consortium (Count XII).

## I. STANDARD OF REVIEW ON A MOTION TO DISMISS

Plaintiff Gregory Bryant–Bruce ("Gregory") is the minor child of Plaintiffs Dr. Cheryl Bryant–Bruce and Gregory David Bryant–Bruce, Sr. Plaintiffs filed this action against the Tennessee Department of Human Services ("DHS"), an agency of the State of Tennessee, and Defendants Charles Wilson, Helen Allen, Steve Allen, Janice Robles and Brenda Stevenson (collectively "State Defendants") employees and/or agents of DHS. Plaintiffs also filed this action against Catholic Social Services ("CSS") and an employee of CSS, Nancy Salyer (collectively "CSS Defendants"), as agents and employees of DHS. Finally, Plaintiffs have filed this action against Vanderbilt University, which owns and operates Vanderbilt University Medical Center and Vanderbilt University Hospital, and Dr. Nikki Oquist, Dr. David Johnson, Dr. Noel Tulipan, Dr. Peter D'Sousa, Dr. Jeremy Garrett, Dr. Fayez Ghishan, Dr. Trent Wallace, Dr. Phillip McGaha, Dr. Joseph Gigante, Dr. Bradley Bullock and Dr. Steven Reilly, physicians at Vanderbilt University Hospital[1] (collectively "Vanderbilt Defendants").

State Defendants, CSS Defendants, and Vanderbilt Defendants each filed a Motion to Dismiss. It is well settled that a court's task in analyzing the sufficiency of a complaint for the purpose of a motion to dismiss is necessarily narrow and limited. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that recovery is very remote and unlikely but that is not the test." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Moreover, in reviewing a motion to dismiss for failure to state a claim upon which relief may be granted, a court must review the complaint in the light most favorable to the plaintiff, construing all of its allegations in his or her favor. *Id.* A complaint should not be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [his or her] claim which would entitle [him or her] to relief." *Id.* (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). *See also G.M. Eng'rs & Assoc. v. W. Bloomfield Township,* 922 F.2d 328, 330 (6th Cir.1990) (citing *Dugan v. Brooks,* 818 F.2d 513, 516 (6th Cir. 1987)) ("[t]his court must accept all of the plaintiff's factual allegations as true and determine whether any set of facts consistent with the allegations would entitled the plaintiff to relief").

## II. FACTS AS STATED IN THE COMPLAINT

Accepting all of Plaintiffs factual allegations as true, as the court must at this stage in the litigation, the factual basis for Plaintiffs' claims as stated in the Complaint is as follows:

Gregory David Bryant–Bruce, Jr. was born on June 10, 1993, at Wright Patterson Air Force Base. Soon thereafter, Gregory

---

**1.** Defendants claim that Dr. Steven Reilly was erroneously identified as Dr. Timothy Reilly.

required multiple blood transfusions and was admitted to the Pediatric Intensive Care Unit at Wright Patterson Air Force Base Hospital. Gregory remained in the Pediatric Intensive Care Unit until his transfer to Vanderbilt University Medical Center ("Vanderbilt") in Nashville, Tennessee, on July 19, 1993. Gregory was transferred to Vanderbilt primarily for the purpose of evaluating his liver function and assessing the need for a liver transplant.

Gregory remained under the care and treatment of Vanderbilt from July 19, 1993, through August 4, 1993. During Gregory's treatment in July 1993, Vanderbilt discontinued his Vitamin D[2] medication against the wishes of Dr. Cheryl Bryant–Bruce and Gregory Bryant–Bruce, Sr. ("Plaintiff parents"). Vanderbilt personnel informed Plaintiff parents that Gregory did not need Vitamin D medication. According to Plaintiffs, Vanderbilt's discontinuance of the Vitamin D medication directly contributed to Gregory's development of osteoporosis (brittle bones). In addition to discontinuing his Vitamin D medication, Vanderbilt also insisted that Plaintiff Cheryl Bryant–Bruce, Gregory's mother, discontinue breast feeding Gregory. This medical advice was also against the wishes of Plaintiff parents. Plaintiffs assert that these disagreements regarding the discontinuance of the Vitamin D medication and breast feeding created an initial, hostile atmosphere between Plaintiff parents and Vanderbilt in which the concerns and opinions of the parents were largely ignored by Vanderbilt thereafter. When Gregory was discharged from Vanderbilt on August 4, 1993, his weight had dropped to three pounds ten ounces.

Gregory returned to the home of his parents, but on September 11, 1993, Gregory was once again admitted to Vanderbilt for possible sepsis (bacteria in the blood). Gregory was given antibiotics and transfusions as treatment. Vanderbilt also determined that Gregory had a bleeding disorder known as Disseminated Intravascular Coagulation ("DIC"), but apparently failed to inform Plaintiff parents of the DIC diagnosis until December 1993, when Gregory was readmitted to Vanderbilt. It was further determined that Gregory was suffering from medical neglect by his parents. His condition was described as "failure to thrive," and tube feeding was instituted for nourishment and stabilization of his condition. Vanderbilt then contacted DHS and reported that it appeared Gregory was the victim of child abuse.

During this time at the hospital, Gregory was being administered oral Vitamin D without any apparent beneficial effect. He was not given Vitamin D by injection. During the September 11, 1993, hospital stay, Plaintiff parents made complaints about Gregory's treatment and hygienic care to pediatric residents Dr. Brad Bullock and Dr. Timothy Reilly. Finally, on September 30, 1993, Plaintiff parents requested that Gregory be transferred from Vanderbilt to Blanchfield Army Hospital ("Blanchfield") in Clarksville, Tennessee.

At Blanchfield, Gregory was under the care of Dr. Richard Papa. Gregory was taken off of tube feedings and placed on oral feedings of formula and breast milk. Gregory experienced good weight gain with the oral feedings and was discharged to his parents on October 4, 1993. On or about October 5, 1993, DHS social worker Janice Robles visited Plaintiff parents' home and made allegations of neglect and mistreatment.

During the month following Gregory's discharge from Blanchfield, he experienced a number of episodes of incarceration of the bowel in the right inguinal hernia, which resulted in blood in his bowel. He was readmitted to Vanderbilt on October 23, 1993, with a confirmed diagnosis of Respiratory Syncytial Virus ("RSV"). Plaintiff parents complained that Gregory was forced to wait approximately twelve hours prior to being admitted for treatment at Vanderbilt, over the adamant insistence of immediate admis-

2. In the Complaint, Plaintiffs initially assert that Gregory suffered from a Vitamin D deficiency, yet later discuss an apparent Vitamin K deficiency. It is unclear whether Plaintiffs are asserting that Gregory suffered from two separate vitamin deficiencies, or only a Vitamin D deficiency. As the Complaint initially discusses Vitamin D, the Court will refer only to Vitamin D. Nevertheless, whether Gregory suffered from a Vitamin D deficiency or a Vitamin K deficiency is not dispositive with respect to the pending Motions.

sion and treatment by his mother, Dr. Cheryl Bryant–Bruce. It is alleged that RSV can be a serious life-threatening illness. Gregory was discharged the following day but was readmitted again on October 26, 1993. At this time, Gregory underwent a number of surgical procedures and a liver wedge biopsy. As a result of these procedures and tests, Gregory was diagnosed with a Vitamin D deficiency. His dosage of Vitamin D was tripled in November, 1993.

On or about December 1, 1993, during a clinical checkup at Blanchfield Plaintiffs allege that Gregory experienced an accidental fall while on the medical examining table causing the back of his head to strike the table. At the time of the fall, Gregory supposedly was wearing a thickly padded snow suit covering the portion of his head which struck the table. On December 6, 1993, Plaintiff parents contend that Gregory sustained another accidental fall at home from a bed during a diaper change. The following day, during a checkup at Blanchfield, Gregory was found to have an abnormally low hematocrit (amount of blood in blood vessels) at Blanchfield, and was then rushed to Vanderbilt, where he was admitted with severe anemia, later developing shock and neurological decompensation. Upon admission, tests revealed Gregory's blood coagulation was grossly abnormal. His coagulative disorder was marked with oozing of blood at venipuncture sites, some of which were found to have oozed for up to twelve hours after initial puncturing.

Following Gregory's December admission to Vanderbilt, Dr. Nikki Oquist, of the Vanderbilt Committee on Child Abuse, determined that Gregory was the victim of Shaken Impact Syndrome ("SIS"). Dr. Oquist's diagnosis of SIS was based upon the discovery of intracranial and retinal hemorrhaging, which appeared to have occurred at different times, and a social history of the patient which was inconsistent with such injuries. Plaintiffs assert that the diagnosis of SIS was inaccurate and contravened accepted standards of practice in the medical community. According to Plaintiffs, at all times relevant to this action, Gregory was in fact suffering from Alagille's syndrome, a genetic liver disease linked to intracranial and retinal hemorrhaging, which continued to progress

undetected until February of 1995 because of the negligence of Vanderbilt Defendants. In December 1993, Plaintiffs allege there were a number of symptoms indicating Alagille's Syndrome, including spontaneous subarachnoid, subdural, and retinal hemorrhaging. Also, Gregory showed no signs of external bruising, fractures, spinal injuries, or other soft-tissue injuries. According to Plaintiffs, the occurrence of intracranial and retinal hemorrhaging were merely symptoms secondary to the conditions of liver dysfunction, Vitamin D Deficiency, DIC, and Alagille's Syndrome.

On or about December 11, 1993, Plaintiff parents completed the first of a series of interviews with DHS concerning possible child neglect or abuse. Plaintiff parents requested that DHS conduct a differential diagnosis of Gregory. This request was ignored. On December 12 or 13, 1993, Plaintiff parents provided DHS with statements and literature suggesting medical explanations of Gregory's physical condition, and once more, denied child abuse or neglect as a contributing cause and requested DHS to reconsider their explanation of non-accidental trauma. On or about December 23, 1993, DHS filed a petition in the Chancery Court of Montgomery County alleging that Gregory had been severely abused on multiple occasions. In spite of the protestations of Plaintiff parents, the State of Tennessee took custody of Gregory as a result of the court proceedings.

Gregory remained hospitalized at Vanderbilt from December 7, 1993, until the middle of January 1994. When Gregory was released, he had a secondary diagnosis of seizures. No follow-up neurological evaluation was scheduled, nor was any maintenance medication prescribed to control the seizures. Immediately after his discharge, Gregory was placed in a foster home in Nashville, Tennessee. During supervised visitations at the foster home, Plaintiff parents observed Gregory suffer multiple, painful seizures which went unchecked until August 1994. During a visit to Vanderbilt in early March 1994, Gregory's seizure activity was witnessed by the Vanderbilt medical staff and he was given mylicon drops in response to a diagnosis that the seizures were gas.

On or about March 14, 1994, after a hearing in the Juvenile Court for Montgomery County, Clarksville, Tennessee, Gregory was declared to be a dependent and neglected child, having been found to have been severely abused while in the care and custody of Plaintiff parents. During the course of the judicial proceedings, Vanderbilt personnel testified that Gregory's medical problems were inconsistent with Plaintiff parents' explanations of accidental falls and, under the circumstances, there were no other reasonable explanations for Gregory's alleged injuries than non-accidental trauma in the form of repeated child abuse.

During an April 1994 Foster Care Review Board ("FCRB") meeting, social worker Helen Allen of DHS charged Plaintiff parents with committing child abuse on Gregory, and attempted to persuade them to sign legal documents terminating their parental rights to Gregory. Plaintiff parents refused to sign the documents. In a later FCRB meeting, Nancy Salyer stated to Plaintiff parents that DHS had no intention of ever returning Gregory to their custody. Plaintiff parents voiced concerns that the FCRB was not representative of the community, but rather was staffed by middle class white women and men. At the third FCRB meeting, a black female was added to the FCRB. During the subsequent meeting, DHS personnel advised Plaintiff parents that they would never be reunited with Gregory if they did not admit that they had abused him. Plaintiff parents refused to do so.

In June 1994, Plaintiff parents moved to Atlanta, Georgia, and filed suit in Georgia state court seeking a transfer to Atlanta, Georgia of Gregory's case pursuant to the Interstate Compact on Child Custody. Also while in Atlanta, Plaintiff parents requested that DHS allow them to obtain a second medical opinion of Gregory at Emory Egleston Hospital Pediatric Care Foundation ("Egleston"). DHS denied the request.

Plaintiff parents appealed the Tennessee decision of the Juvenile Court of Montgomery County. Following a *de novo* review of the lower court's decision, the Circuit Court of Montgomery County found upon clear and convincing evidence that Gregory was a dependent and neglected child by virtue of severe abuse. The Court ruled that Gregory suffered severe injuries including injury to the brain and retinal injury on more than one occasion while in the care of Plaintiff parents as a result of trauma. The Court's order further provided that Gregory would remain in the custody of DHS. During the court proceedings, DHS social worker Brenda Stevenson remarked that Plaintiff parents' home was "more than adequate for these kind of people."

While in foster care, Gregory continued to be treated at Vanderbilt from time to time. In August 1994, Gregory was found to have multifocal seizures and was prescribed dilantin. In September 1994, Plaintiff parents consulted with Dr. Benjamin Gold and Mary Ellen O'Neill at Egleston in Atlanta regarding Gregory. As a result of this consultation, Egleston made numerous requests to Vanderbilt for Gregory's complete medical records in order to conduct a review and evaluation, but all of such requests were refused.

During the period of time that Gregory was in DHS custody, he continued to suffer seizures, failed to thrive, and his condition deteriorated dramatically. During November of 1994, Gregory was hospitalized at Vanderbilt following repeated bleeding episodes. In January 1995, Dr. Cheryl Bryant–Bruce took Gregory to Vanderbilt for admission because he had been extremely sick on several scheduled visits. On a scheduled visit with Gregory on February 9, 1995, Plaintiff parents drove him to Egleston Hospital in Atlanta to obtain a second opinion on his medical condition. On the same day, the State of Tennessee issued a warrant for the arrest of Dr. Bryant–Bruce based upon information provided by DHS that Gregory had been intentionally removed from DHS custody. Dr. Bryant–Bruce was arrested at Gregory's bedside and incarcerated for thirty hours. Egleston was forbidden by DHS to perform an evaluation or provide a second opinion on Gregory's condition. On February 10, 1995, DHS contacted Egleston and demanded that Plaintiff parents not be allowed to visit Gregory.

Pursuant to a lawsuit filed by Plaintiff parents in Atlanta, on February 17, 1995, Dekalb County Superior Court Judge Robert J. Castellani issued a temporary re-

straining order permitting Egleston to perform a medical evaluation of Gregory. During the course of this evaluation, Vanderbilt and DHS refused to release complete Vanderbilt medical records pertinent to Gregory. On or about February 28, 1995, Egleston determined that Gregory was afflicted with Alagille's Syndrome. The results of the evaluation were made known to DHS and Vanderbilt, and on March 3, 1995, Gregory was returned to DHS foster care in Tennessee.

On March 9, 1995, Plaintiff Dr. Bryant-Bruce appeared in Nashville, Tennessee, to face criminal charges of custodial interference, interstate flight and fugitive from justice, all arising from the removal of Gregory to Egleston in Atlanta. The Grand Jury declined to indict her.

On March 31, 1995, Plaintiff parents obtained an order granting a new trial regarding the custody of Gregory in the Circuit Court of Montgomery County on the basis of newly discovered evidence. At the trial, Plaintiff parents presented to the Court the live testimony of Egleston physicians who had treated and diagnosed Gregory. At the close of Plaintiffs' proof, DHS and Vanderbilt refused to rebut said findings or present any evidence. On June 12, 1995, the Circuit Court of Montgomery County returned custody of Gregory to Plaintiff parents and terminated any involvement of DHS.

### III. STATE DEFENDANTS' AND CSS DEFENDANTS' MOTIONS TO DISMISS

The Court will first consider the Motions to Dismiss filed by State Defendants and CSS Defendants. In the State's Motion to Dismiss, the State argues that this case should be dismissed because: 1) the claims against State Defendants in their official capacities are barred under the Eleventh Amendment, 2) the claims against them in both their individual and official capacities should be dismissed because Plaintiffs waived any federal cause of action by filing a claim with the Tennessee Claims Commission based on the same alleged acts or omissions,

3) Plaintiffs' claims are barred by the statute of limitations, 4) Defendants are entitled to absolute and/or qualified immunity, and 5) the claims against Charles Wilson, Helen Allen, Steve Allen, Janice Robles and Brenda Stevenson in their individual capacities should be dismissed because the allegations against them are vague and conclusory. CSS Defendants likewise filed a Motion to Dismiss relying upon those arguments asserted by State Defendants.[3]

State Defendants and CSS Defendants contend that the claims against them in there official capacities should be dismissed because they are barred under the Eleventh Amendment. It is well-settled that the Eleventh Amendment forbids suits by a citizen of a state against that state in federal court. *See Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890); *Mackey v. Cleveland State University,* 837 F.Supp. 1396, 1404 (N.D.Ohio 1993). Additionally, in *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), the United States Supreme Court held that state officials sued in their official capacity are not "persons" under Section 1983 and, therefore, they are immune from suit under the Eleventh Amendment. The Supreme Court limited its holding in *Will,* however, to cases not requesting prospective relief. *See Will,* 491 U.S. at 71, n. 10, 109 S.Ct. at 2312, n. 10 ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'") (citations omitted). Furthermore, the Eleventh Amendment does not bar suits against a state official in his or her individual capacity. As stated by the Supreme Court, "it has been settled that the Eleventh Amendment provides no shield for a state official confronted by a claim that he had deprived another of a federal right under the color of state law." *Scheuer v. Rhodes,* 416 U.S. 232, 237, 94 S.Ct. 1683, 1687, 40 L.Ed.2d 90 (1974). As noted in *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908),

---

**3.** In the Complaint, Plaintiffs allege that Defendant Nancy Salyer and CSS were agents and/or employees of DHS, a state agency. Moreover, Plaintiffs do not dispute that, as agents and/or employees of the State, these Defendants are entitled to rely upon the same defenses asserted by State Defendants.

when a state official acts in violation of the U.S. Constitution, that official "comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected *in his person* to the consequences of his individual conduct." *Id.* at 159–60, 28 S.Ct. at 454 (emphasis added). In the present case, Plaintiffs have charged that State Defendants and CSS Defendants, as agents and/or employees of the State, are subject to liability in their official capacities.[4] However, as claims against state actors acting in their official capacities are barred, the claims filed against State and CSS Defendants[5] in their official capacities should be dismissed.

▇▇ State Defendants and CSS Defendants next claim that the suit against them is barred because Plaintiffs have filed an identical claim with the Tennessee Claims Commission. Under Tennessee Code Annotated § 9–8–307(b):

> Claims against the state filed [with the Tennessee Claims Commission] shall operate as a waiver of any cause of action, based on the same act or omission, which the claimant has against any state officer or employee. The waiver is void if the commission determines that the act or omission was not within the scope of the officer's or employee's office or employment.

T.C.A. § 9–8–307(b). The Sixth Circuit has held that this provision requires a waiver of "*any* cognate federal cause of action." *White v. Gerbitz,* 860 F.2d 661, 662 (6th Cir.1988), *cert. denied,* 489 U.S. 1028, 109 S.Ct. 1160, 103 L.Ed.2d 219 (1989) (holding that the plaintiff had waived his cause of action in federal court by filing a substantially similar claim with the Tennessee Claims Commission).

▇▇ Plaintiffs do not dispute that they have waived their claims against State and CSS Defendants in their officials capacities. Nor do they dispute that the claims pending before the Tennessee Claims Commission are based on the same factual allegations asserted in this case. Rather, Plaintiffs assert that filing a claim with the Tennessee Claims Commission does not act as a waiver against state defendants in their individual capacities. However, the Sixth Circuit has interpreted the waiver provision expansively as "[mandating] a complete waiver of any companion federal cause of action against individual state officers or employees." *Hicks v. Norris,* No. 89–5939, 1990 WL 61171, at *1 (6th Cir. May 10, 1990).[6] Moreover, while not explicitly addressing the issue, the Sixth Circuit implicitly determined that suits against a state employee in his or her individual capacity should be dismissed. Specifically, the Sixth Circuit held that, should the Tennessee Claims Commission determine that the defendants' acts were outside the scope of their employment, then the plaintiff may refile in federal court against those defendants, *White,* 860 F.2d at 664 (holding that the claims should be dismissed but that, if the Tennessee Claims Commission determines that Defendants' acts were outside of the scope of their employment, the plaintiffs may present an order within sixty (60) days of the state action reinstating their claims to the federal district court's docket with the statute of limitations tolled in the interim), indicating that it is appropriate to dismiss a cause of action against defendants for conduct committed outside the scope of their employment. However, generally, a suit

---

4. In their response to State Defendants' Motion, and during oral argument held before the Court on March 28, 1997, Plaintiffs conceded that the claims against State Defendants in their official capacities are barred under the Eleventh Amendment.

5. Although Plaintiffs have not disputed that CSS Defendants are entitled to rely upon those defenses asserted by the State, the Court notes that it is also undisputed that CSS Defendants were acting as agents and/or employees of the State. As such, the Eleventh Amendment is equally applicable to CSS Defendants. *See Poe v. J.L.*

*Henderson,* No. 85099, 1990 WL 8036, at *1 (E.D.Ky. Jan. 30, 1990) ("[I]t is precisely because of their agent status that the eleventh amendment bars [the plaintiff's] claims against them.").

6. The Court notes that the Sixth Circuit's broad interpretation of the waiver statute has not come without disagreement. *See White,* 860 F.2d at 665 (Jones, J., dissenting) (commenting that the majority "exalts a state waiver provision above a plaintiff's right to seek relief for unconstitutional acts"). However, it is not for this Court to question established Sixth Circuit precedent.

against a state official in his or her individual capacity is based on conduct taken outside of the scope of his or her authority. *Nix v. Norman,* 879 F.2d 429, 431 (8th Cir.1989); *Briggs v. Goodwin,* 569 F.2d 1, 4 (D.C.Cir. 1977), *reversed on other grounds by Stafford v. Briggs,* 444 U.S. 527, 100 S.Ct. 774, 63 L.Ed.2d 1 (1980). Moreover, as suits against state actors in their official capacities are already barred by the Eleventh Amendment, there would be no need for the Sixth Circuit to reach its decision in *White* unless it was considering claims filed against a defendant in his or her individual capacity as well.[7] Although the Sixth Circuit is not entirely clear, the Court finds that, based on Sixth Circuit precedent, the most reasonable interpretation of the Tennessee statute is that filing a claim in the Tennessee Claims Commission waives all federal causes arising from the same facts against employees of the state. Should such acts be determined to be outside the scope of employment, however, the Sixth Circuit's interpretation of the statute permits refiling of such claims in federal court against the defendants in their individual capacities.

▪ Plaintiffs also assert that T.C.A. § 9–8–307(b) violates the Supremacy Clause of the United States Constitution. Again, the Sixth Circuit has upheld the validity of T.C.A. § 9–8–307(b). *See White,* 860 F.2d 661 (finding that the district court erred in not dismissing the plaintiff's federal causes of action because the plaintiff had filed a similar action with the Tennessee Claims Commission). As such, the Court finds Plaintiffs' argument to be without merit.[8]

Accordingly, State Defendants' Motion to Dismiss and CSS Defendants' Motion to Dismiss are GRANTED, and this case with respect to these Defendants is DISMISSED

with the caveat that, should the Tennessee Claims Commission determine that Defendants' acts were outside of the scope of their employment, Plaintiffs may file a motion within sixty (60) days of the dismissal of the state action requesting that their claims be reinstated on federal district court's docket. Meanwhile, the statute of limitations on Plaintiffs' cause of action will be tolled in the interim.

Defendants have raised other defenses to this cause of action, including a statute of limitations defense and whether Defendants are entitled to absolute and/or qualified immunity. However, the Court finds that such matters are not ripe for review. Should the Tennessee Claims Commission determine that the acts of Defendants were taken within the scope of their employment, it would be unnecessary for this Court to address Defendants' additional defenses.

## IV. STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Vanderbilt Defendants filed a Motion for Summary Judgment. In ruling on a motion for summary judgment, this Court must construe the evidence produced in the light most favorable to the non-moving party, drawing all justifiable inferences in his or her favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). A party may obtain summary judgment if the evidentiary material on file shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of satisfying the court that the standards of Rule 56 have been met. *See Martin v. Kelley,* 803 F.2d

---

7. Plaintiffs rely upon a footnote contained in *White* which states that the defendants were sued in their official capacities. *See White,* 860 F.2d at 664 n. 2. However, the court does not state that defendants were *not* sued in their individual capacities as well. Moreover, the court's discussion in this footnote makes it clear that dismissal of the claims against these defendants in their official capacities was appropriate under the Eleventh Amendment.

8. Dismissal also may be warranted on yet another ground not raised by the parties, namely un-

der the *Younger* abstention doctrine. *Federal Express v. Tennessee Public Service Commission,* 925 F.2d 962, 967 (6th Cir.1991), *cert. denied,* 502 U.S. 812, 112 S.Ct. 59, 116 L.Ed.2d 35 (1991) (holding that, under the *Younger* abstention doctrine, a federal district court should abstain from exercising jurisdiction where: 1) there is an ongoing state judicial proceeding, 2) the proceedings implicate important state interests, and 3) there is an adequate opportunity in the state proceedings to raise constitutional challenges).

236, 239 n. 4 (6th Cir.1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact which is disputed. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. at 2510. If so, summary judgment dismissal is inappropriate.

## V. FACTS APPLICABLE TO THE SUMMARY JUDGMENT MOTION

While the Court must rely upon the facts as stated in the Complaint for the purposes of ruling on the Motions to Dismiss filed by each of the Defendants, both Vanderbilt Defendants and Plaintiffs have filed a Statement of Undisputed Material Facts pursuant to Local Rule 8(b)(7) along with other supplemental materials upon which the Court will rely for the purposes of this Motion for Partial Summary Judgment. Based on these submissions, the circumstances giving rise to this cause of action are as follows:

As noted above, on December 7, 1993, Gregory was found to have an abnormally low hematocrit at Blanchfield, and was rushed to Vanderbilt University Hospital. A day or two after Gregory's admission to Vanderbilt Hospital, Dr. Nikki Oquist, a pediatrician at Vanderbilt, received a call to consult with respect to the possibility that Gregory was the victim of abuse. Dr. Oquist was told that Gregory had unexplained intracranial hemorrhages. On December 9, 1993, Dr. Oquist examined Gregory in the Pediatric Intensive Care Unit. In diagnosing Gregory, Dr. Oquist was aware that Gregory suffered from a liver disease and that such disease had been diagnosed as "non-syndromic paucity of interlobular bile ducts." Dr. Oquist knew it was possible that Gregory suffered from Alagille's Syndrome. However, according to Vanderbilt Defendants, the tests run on Gregory to determine whether he had Alagille's Syndrome were inconclusive. Vanderbilt Defendants also assert that early detection of Alagille's Syndrome would not have changed the course of treatment for Gregory.

According to Vanderbilt Defendants, the Vanderbilt physicians conducted an appropriate, careful and complete work-up on Gregory and determined that his injuries were inconsistent with his medical history. In particular, in order to make the diagnosis as to the cause of Gregory's hemorrhages, Dr. Oquist obtained the consultations of five other physicians: Dr. David Johnson, a pediatric ophthalmologist, Dr. Noel Tulipan, a neurosurgeon, Dr. Jeremy Garrett, a pediatric intensivist and Gregory's attending physician in the Pediatric Intensive Care Unit, Dr. John Edwards, a pediatric hematologist/oncologist, and Dr. Robert Kessler, a neuroradiologist.

Dr. Johnson reported that Gregory had a large number of hemorrhages in the retina in both eyes, and that these retinal hemorrhages were weeks to months old, meaning that the hemorrhages were of different ages. According to Vanderbilt Defendants, Mr. Johnson reported that these findings were consistent with "severe head trauma of multiple occurrences." Dr. Kessler also reported that Gregory's CT Scan showed both new and old hemorrhages within his brain and that Gregory had a large number of hemorrhages in the retina in both eyes. Dr. Tulipan reported that Gregory had intracranial hemorrhages of different ages and concluded that these findings created a high suspicion of abuse. Dr. Edwards reported that he was unaware of any congenital or acquired defect associated with retinal hemorrhages of varying ages. Finally, Vanderbilt Defendants assert that Dr. Garrett agreed with Mr. Oquist that Gregory's injuries were most likely caused by abuse.

On or about December 9, 1993, Dr. Cheryl Bryant–Bruce, Gregory's mother, told Dr. Oquist about two incidents of trauma involving Gregory which had occurred before the December 7th admission, one in which Gregory was flipped to the floor from a height of approximately two and a half feet, landing on a padded carpeted floor on the left side of his face, and one in which Gregory was in an upright position on a medical examining table and fell back to the table. According to Vanderbilt Defendants, Gregory's retinal hemorrhages were inconsistent with the two short falls described by his mother. Moreover, Vanderbilt Defendants assert that Dr. Oquist's opinion was, and still is, that severe trauma is a reasonable and likely explanation for the type of hemorrhages exhibited by Gregory. In fact, at the time he examined

Gregory in December 1993, Dr. Oquist had studied an article published in the July 1993 edition of *Pediatrics*. The article discussed a study conducted to determine the likelihood of injuries occurring to children under the age of six who fall out of bed. The study included 207 children who had fallen from cribs or beds from heights of twenty to fifty-four inches. Out of all those falls discussed in the study, there was only one simple skull fracture and one broken collar bone. None of the children studied suffered any serious, multiple, or life-threatening injuries from those falls. (Gregory's intracranial hemorrhages were multiple, severe, and life-threatening.) Moreover, the conclusion of the study was that, because falls from short distances are unlikely to produce serious injury, the reliability of the history provided to a physician should be questioned when a child had significant injuries said to have resulted from short falls.

While Vanderbilt Defendants maintain that Dr. Oquist's conclusion that Gregory had been the victim of child abuse, Plaintiffs assert that such a conclusion is unreasonable. In reaching this conclusion, Plaintiffs rely upon the medical opinions of Dr. Benjamin Gold, an assistant professor of pediatrics specializing in gastroenterology, who treated Gregory at Egleston, Dr. James A. Barfield, an assistant professor of child neurology at Emory University, who reviewed Gregory's medical history and evaluated him in Atlanta, Dr. William R. Treem, a professor of pediatrics at Duke University School of Medicine and chief of pediatric gastroenterology hepatology and nutrition at the Duke University Medical Center, and Dr. Antonio Capone, an ophthalmologist with a subspecialty in vitrioretinal surgery and medical problems of the retina and a member of the Emory Clinic.

Dr. Gold concluded that Gregory's underlying liver disease may provide a more plausible explanation for the presence of blood in the child's brain and eyes than SIS, and additionally concluded that Gregory's coagulation disorders were also a likely cause of his retinal hemorrhages. Plaintiffs also rely upon the opinion of Dr. Barfield, who concluded that Gregory's coagulation disorder and/or his subarachnoid bleeding possibly provided an equally or more reasonable ex-

planation for his symptoms than SIS, and found that the presence of abuse or trauma was not required to explain Gregory's brain trauma. Plaintiffs also assert that Dr. Treem similarly recognized that an infant with Gregory's liver condition could sustain a serious intracranial hemorrhage from a relatively minor head trauma, and concluded that questions must be raised about whether it was reasonable to attribute Gregory's intracranial and retinal hemorrhages to SIS. Finally, Plaintiffs assert that the diagnosis of SIS was contradicted by Gregory's physical condition, and that Vanderbilt physicians noted virtually none of the physical symptoms typically associated with SIS. For instance, Vanderbilt doctors did not find neck or spinal injuries, swollen joints, fractured bones, or external bruising.

Plaintiffs assert that Vanderbilt Defendants' initial diagnosis of Gregory was made in bad faith. In support of this assertion, Plaintiffs rely upon the alleged unreasonableness of Gregory's evaluation. Plaintiffs also assert Vanderbilt physicians' failure to reassess their diagnosis of SIS, and Dr. Oquist's failure to conduct a differential diagnosis, which, according to Plaintiffs, would have determined whether Gregory's liver problems, bleeding disorders, and vitamin absorption problems may have contributed to his retinal and intracranial hemorrhages, are also evidence of bad faith. Plaintiffs further assert that Vanderbilt physicians deliberately ignored medical literature supplied by Plaintiff parents which suggested that Gregory's symptoms were the result of his underlying liver disease, bleeding disorders, and vitamin absorption problems. Finally, Plaintiffs assert that Dr. Oquist's actions went beyond the scope of his role as treating physician for Gregory. They allege that he was prejudiced against Plaintiff parents and became an advocate against them. According to Plaintiffs, he testified falsely at the DHS hearing and wrote Circuit Court Judge Robert Weidemeyer that he "has serious concerns about the fact that [Gregory] is being considered for placement back with his biological parents," and accused Dr. Bryant–Bruce as having a "flippant attitude."

## VI. VANDERBILT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

■ Vanderbilt Defendants filed this Partial Motion for Summary Judgment seeking dismissal of Counts I–III and Counts V–XII. Defendants assert that, with the exception of Count IV, the damages claimed flow from the allegedly erroneous report made to DHS. According to Defendants, under Tennessee law, they are immune from liability for such conduct pursuant to Tennessee Code Annotated § 37–1–401 to 414. This Act was enacted to:

> protect children whose physical or mental health and welfare are adversely affected by brutality, abuse or neglect by requiring reporting of suspected causes by any persons having cause to believe that such case exists. It is intended that, as a result of such reports, the protective services of the state shall be brought to bear on the situation to prevent further abuses, to safeguard and enhance the welfare of children, and to preserve family life. This part shall be administered and interpreted to provide the greatest possible protection as promptly as possible for children.

T.C.A. § 37–1–402(a). Under this Act, any person including a physician, nurse, or other hospital personnel "engaged in the admission, examination, care or treatment of persons" that has:

> knowledge of or [is] called upon to render aid to any child who is suffering from or has sustained any wound, injury, disability, or physical or mental condition which is of such a nature as to reasonably indicate that it has been caused by brutality, abuse or neglect or which on the basis of available information reasonably appears to have been caused by brutality, abuse or neglect, shall report such harm immediately . . .

T.C.A. § 37–1–403(a). Any person that knowingly fails to report suspicions of child abuse in violation of T.C.A. § 37–1–403 may be assessed a fine of $50. T.C.A. § 37–1–412.[9] While failure to comply with the statute may subject an individual to criminal liability, "[a] person reporting harm shall be presumed to be acting in good faith and shall thereby be immune from any liability, civil or criminal, that might otherwise be incurred or imposed for such action." T.C.A. § 37–1–410(a). This immunity extends to the diagnosis, reporting, and subsequent communications with state officials regarding the medical diagnosis rendered by the physicians. *See McLaughlin v. Clayton, et al.*, No. 91C–476, at 4 (finding immunity for conduct in reporting the harm to a child, for receiving conflicting medical opinions by family physicians, and for all subsequent communications with state officials regarding the opinions of the family physicians).

In the present case, Plaintiffs concede that, under Tennessee law, physicians and other health care providers are typically entitled to immunity for reporting their suspicions of child abuse. Nevertheless, Plaintiffs assert that Vanderbilt Defendants are not entitled to rely upon the statutorily granted immunity because they acted in bad faith in diagnosing Gregory. In order to deprive Vanderbilt Defendants of their immunity, Plaintiffs must demonstrate that Vanderbilt Defendants acted in bad faith by clear and convincing evidence. *See McLaughlin v. Clayton, et al.*, No. 91C–476, at 4 (3rd Cir. Court for Davidson County, Tennessee, Aug. 20, 1991) (granting defendant-physicians motion for summary judgment based on a finding that defendants were entitled to immunity because the plaintiff failed to meet the burden of demonstrating bad faith by clear and convincing evidence).

■ In support of their contention that Vanderbilt Defendants reported their suspicions of child abuse in bad faith, Plaintiffs assert that they exhibited gross negligence in their diagnosis of Gregory's condition. In particular, Plaintiffs assert that any conclusion that there was abuse was unreasonable, given the absence of any objective signs of abuse and, as such, Vanderbilt Defendants are not entitled to immunity. *See Evans v. Torres*, No. 94–C–1078, 1996 WL 5319, at *9 (N.D.Ill. Jan. 4, 1996) (finding that the defendants were not entitled to rely upon the state

---

**9.** While an individual that fails to report child abuse may receive a fine, a person who knowingly "maliciously reports, or causes, encourages, aids, counsels or procures another to report, a false accusation of child sexual abuse commits a Class E felony." T.C.A. § 37–1–413.

statute providing immunity for those who report suspicions of child abuse where there was no objective physical signs of abuse).[10] While Plaintiffs repeatedly assert that Vanderbilt Defendants were grossly negligent, the admissible evidence presented by Plaintiffs' own physicians does not support such a conclusion. For instance, Plaintiffs rely upon the opinion of Dr. Benjamin Gold. Dr. Gold concluded that Gregory's "underlying liver disease may provide a more plausible explanation for the presence of blood in the child's brain and eyes than shaken baby syndrome." Plaintiffs' Statement of Undisputed Facts, ¶ 132. As discussed more specifically in a letter written by Dr. Gold which Plaintiffs discuss in their brief:

> [i]t is widely accepted in the medical community that the top cause of retinal hemorrhage in children is trauma (which includes accidental and non-accidental, i.e. abuse). The medical literature is clear on this causation. However, if a child has a coagulation disorder or bleeding diathesis, one must consider other etiologies as likely possibilities. Therefore, in the case of baby Gregory, two etiologies, other than abuse, could have explained the presence of blood in the child's brain and eyes. As mentioned previously, the diagnosis of Alagille's Syndrome may provide another more plausible explanation for the type of bleeding this child experienced in 12/93.

*See* Plaintiffs' Memorandum in Opposition to Vanderbilt Defendants' Motion for Partial Summary Judgment, at p. 42 (quoting Dr. Gold's letter dated May 8, 1995 to James L. Allen, Attorney for DHS). While Plaintiffs assert that Gregory exhibited "virtually none of the physical symptoms typically associated with Shaken Infant Syndrome", *id.* at p. 40, Plaintiffs' own physician admits that the leading cause of retinal hemorrhaging is trauma, including non-accidental trauma. Plaintiffs' also rely upon the opinion of Dr. James A. Barfield who concluded that "there are at least two alternative explanations which are equally reasonable or more

reasonable [than abuse]." Memorandum in Opposition to Vanderbilt Defendants' Motion for Partial Summary Judgment, at p. 41 (citing Dr. Barfield's letter dated May 12, 1995, to James L. Allen, Attorney for DHS). Dr. Barfield further opined that "Gregory's coagulation disorder and/or his subarachnoid bleeding possibly provided more reasonable explanations for his symptoms than shaken baby syndrome[.]" Plaintiffs' Statement of Undisputed Facts, at ¶ 133. Finally, Dr. William R. Treem concluded that "questions must be raised about whether it was reasonable to attribute Gregory's intracranial and retinal hemorrhages to the 'shaken baby syndrome.'" *Id.* at ¶ 134. While the statements made by Plaintiffs' physicians constitute evidence that the physicians at Vanderbilt may have been incorrect or even negligent in their diagnosis of Gregory's condition, they do not support the conclusion that the physicians acted in bad faith, were grossly negligent in their duties, or that there were no objective signs of abuse. In fact, as noted above, the undisputed evidence demonstrates that Gregory suffered from retinal hemorrhaging and, according to Plaintiffs' own expert, the leading cause of retinal hemorrhaging is trauma, including non-accidental trauma.

 In addition to their allegations of gross negligence, Plaintiffs also assert that Vanderbilt Defendants acted in bad faith because they stubbornly refused to reassess their original diagnosis of Gregory and refused to admit that their initial diagnosis was in error. Plaintiffs also rely upon the alleged refusal of Vanderbilt to release Gregory's medical records when requested to do so by Egleston and other conduct which, according to Plaintiffs, demonstrates that Vanderbilt was attempting to cover-up their initial misdiagnosis. However, these events occurred well after the original report of suspected child abuse and do not support a finding of bad faith in complying with the reporting requirements of the statute.[11]

---

10. Plaintiffs cite *Evans* in support of their position that gross negligence and/or a finding that there were no objective signs of abuse is sufficient to overcome the presumption of good faith.

11. The Court is not suggesting that events which occur after the original report of abuse cannot be

used to demonstrate bad faith. Rather, the Court merely recognizes that, under the facts of this case, Plaintiffs have failed to demonstrate that these subsequent events prove bad faith in the original diagnosis and treatment.

Plaintiffs next claim that Vanderbilt Defendants are not entitled to immunity because they intentionally testified falsely at custody proceedings. In particular, Plaintiffs assert that Dr. Oquist lied in a deliberate effort to mislead the court by stating that Gregory was "not a sick infant" which, according to Plaintiffs is a blatant denial of the child's severe medical problems. However, a close examination of the record reveals no admissible evidence to support Plaintiffs' position.[12] The document referred to by Plaintiffs states that Dr. Oquist said, "I wouldn't say a very very sick child." The remainder of the document puts the statement in context by describing Gregory's diagnosis, condition and treatment. Plaintiffs cannot raise a genuine issue of material fact by taking a statement out of context and mischaracterizing it. The evidence does not support such a conclusion.

 Plaintiffs next assert that they have demonstrated that Dr. Oquist acted in bad faith based on his statements regarding Plaintiff parents. According to Plaintiffs, Dr. Oquist stated that Plaintiff parents had a "flippant attitude" and they had "lofty dreams." These two isolated comments are not sufficient to show bad faith or raise a genuine issue of material fact about the matter. There is a presumption that the initial report was made in good faith.[13] *See* T.C.A. § 37–1–410(a). Furthermore, in view of the circumstances under which reports of child abuse are made, it is incumbent upon Plaintiffs to show more than mere dislike for the alleged perpetrators or their suspected actions. Plaintiffs must demonstrate by *clear and convincing evidence* that Vanderbilt Defendants acted in bad faith. The suggested comments cannot demonstrate bad faith by clear and convincing evidence as a matter of law. As such, the Court finds that Vanderbilt Defendants are entitled to rely upon the statutorily granted immunity for their conduct in reporting their suspicions of child abuse in the case of Gregory Bryant–Bruce, Jr.

 Although Vanderbilt Defendants are immune for those actions taken with respect to reports of suspected abuse, the statutorily granted immunity is not unlimited. While a physician receives protection for diagnosing, reporting, and testifying regarding suspected abuse, *McLaughlin,* No. 91C–476, at 4 (finding that physicians were entitled to immunity for reporting suspicions of child abuse, and for reviewing conflicting medical opinions of physicians employed by the family and all subsequent communications with state officials about the opinions of family physicians), a physician is not immune for those actions unrelated to a physician's duty to report child abuse. For instance, a doctor is not shielded from a medical malpractice claim merely because he or she suspected that abuse may have been involved. Thus, while the actions of that physician and other medical personnel arising from the reporting of child abuse are protected, a negligent misdiagnosis or treatment may not be. Such claims, however, would arise under a theory of malpractice or negligence, rather than from reporting a medical condition based on suspected child abuse. Also, the immunity afforded physicians for reporting suspected child abuse does not shield them from other improper actions taken beyond the reporting requirement. In summary, physicians are immune only to the extent that their conduct arises from their duty to report suspicions of child abuse, which may include diagnosing a child's medical condition, contacting the appropriate authorities, and preparing for and later testifying as to their opinions.

Accordingly, with respect to Vanderbilt Defendants' Motion for Partial Summary Judgment, this Motion is GRANTED to the extent that Defendants seek immunity for actions arising from their duty to report suspicions of child abuse, and DENIED to the extent that Defendants seek immunity for actions that do not arise from such duty.

---

12. Plaintiffs also referred to the affidavit of Gregory Bryant–Bruce, Sr., in which he described Dr. Oquist's testimony as supporting their position that Dr. Oquist lied at DHS hearings. However, Mr. Bruce's version of Dr. Oquist's testimony is impermissible hearsay.

13. Of course, if a plaintiff demonstrates that the physicians' decision to report abuse was motivated primarily by his or her dislike of the parents, the presumption of good faith may be overcome.

## VII. VANDERBILT DEFENDANTS' MOTION TO DISMISS

Vanderbilt has also filed a Motion to Dismiss seeking dismissal of all counts filed against them with the exception of Count IV, the claim for professional negligence. Vanderbilt Defendants assert that Counts I, II, and III, namely those claims filed under Sections 1983, should be dismissed because Vanderbilt Defendants are not state actors. Furthermore, the claims under Section 1985 and Section 1986 should be dismissed because Plaintiffs failed to plead facts that would demonstrate the existence of a conspiracy. Vanderbilt Defendants also claim that Plaintiffs failed to allege specific conduct committed by Vanderbilt Defendants which would give rise to claims of malicious prosecution, abuse of process, invasion of privacy, loss of consortium, defamation and outrageous conduct. Finally, Defendants also claim that Tennessee does not recognize the invasion of privacy claim asserted by Plaintiffs, namely that of false light, nor does Tennessee recognize loss of consortium except as an element of damages.

### A. SECTION 1983

Vanderbilt Defendants assert that the claims filed under Section 1983 should be dismissed against them because, as private individuals and entities, they did not act 'under color of state law.' In order to state a claim under Section 1983, a plaintiff must demonstrate not only that he or she was deprived of rights under the United States Constitution or under federal law, but must also demonstrate that such deprivation occurred 'under color of state law.' *Melson v. The Kroger Co.*, 578 F.Supp. 691, 695 (S.D.Ohio 1983) (citing cases). While typically not liable under Section 1983, a private actor may nevertheless be held liable if he or she "is a willful participant in the joint activity with the State or its agents." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). *See also Melson*, 578 F.Supp. at 695 (holding that defendants that are not state officials may be liable under Section 1983 if they " 'jointly participated' in the actions of state officials") (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 931, 102 S.Ct. 2744, 2750, 73 L.Ed.2d 482 (1982)). A private citizen may also be held liable under Section 1983 if he or she conspires with a state actor to commit the offensive conduct. *Nation v. Wedemeyer*, No. 95–6354, 1996 WL 452861, at *2 (6th Cir.1996). *See also Davis v. Union Nat'l Bank*, 46 F.3d 24, 25 (7th Cir.1994), *cert. denied*, 514 U.S. 1065, 115 S.Ct. 1696, 131 L.Ed.2d 560 (1995) (holding that, in order to hold a private actor liable for malicious prosecution under Section 1983, "[t]he private actor must wrongfully influence the state's decision to prosecute through a conspiracy."). The mere furnishing of information to state officials does not constitute joint action sufficient to render a private citizen a state actor under Section 1983 or under Section 1985. *See Benavidez v. Gunnell*, 722 F.2d 615, 618 (10th Cir.1983).

Plaintiffs admit that a private hospital and its employees are not typically state actors for the purposes of Section 1983. Nevertheless, Plaintiffs assert that Defendants should be liable under Section 1983 because they conspired with state officials to deprive them of their constitutional rights. With the exception of conclusory statements in the Complaint that all of the Defendants in this case were acting in concert, it appears that the only basis for Plaintiffs' allegations of conspiracy is that Vanderbilt physicians reported allegations of abuse and testified at DHS hearings. However, as discussed above, Vanderbilt Defendants are immune from suit for such actions. Moreover, even assuming that they should not receive immunity, such conduct does not demonstrate the existence of a conspiracy or that the Defendants were acting in concert. If this were the case, any physician reporting suspected child abuse would be considered a conspirator and would also be subject to liability under Section 1983. Of course, it is also possible that Plaintiffs are suggesting conspiracy based on the similarities in the conduct of DHS and Vanderbilt. However, the similarities in conduct discussed in the Complaint (e.g. failure to release medical records) are insufficient to support Plaintiffs' claim that the Defendants acted in concert. Moreover, it is well-settled that conspiracy claims "must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under Section

1983." *Gutierrez v. Lynch,* 826 F.2d 1534, 1538 (6th Cir.1987). In the Complaint, Plaintiffs have only alleged vague and conclusory allegations that are insufficient to state a claim against a private actor under Section 1983.

The Court notes that additional allegations are contained in Plaintiffs' briefs and in their oral arguments to the Court which are not contained in the Complaint, but such allegations cannot be considered by the Court for purposes of this Motion. Therefore, for the foregoing reasons, Vanderbilt Defendants' Motion to Dismiss with respect to Count I is GRANTED.

## B. SECTION 1985 AND SECTION 1986

 Defendants contend that Plaintiffs' claims under 42 U.S.C. § 1985 and § 1986 should be dismissed for failure to allege the existence of a conspiracy. Under the relevant provision of Section 1985:

> If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages ... against any one or more of the conspirators.

42 U.S.C. § 1985(3). Under Section 1986, a person who has knowledge of a violation of Section 1985 may be liable if he or she had the power to prevent the violations but neglected or refused to do so. 42 U.S.C. § 1986. In order to state a claim under

Section 1985 and Section 1986,[14] a plaintiff must allege: 1) the existence of a conspiracy, and 2) that the actions complained of were taken on the basis of race or some other class-based distinction. *Dunn v. State of Tennessee,* 697 F.2d 121, 124 (6th Cir.1982), *cert. denied,* 460 U.S. 1086, 103 S.Ct. 1778, 76 L.Ed.2d 349 (1983) (discussing the elements required to prove a Section 1985 claim). As stated by the United States Supreme Court in *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), "the language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' actions." *Id.* at 102, 91 S.Ct. at 1798 (emphasis in original). Furthermore, in order to demonstrate the necessary conspiracy, a plaintiff must allege specific acts or means by which the defendants were alleged to have conspired. *Haverstick Enterprises, Inc. v. Financial Federal Credit, Inc.,* 803 F.Supp. 1251, 1259 (E.D.Mich.1992), *aff'd,* 32 F.3d 989 (1994) (citing *Copley v. Sweet,* 234 F.2d 660 (6th Cir.), *cert. denied,* 352 U.S. 887, 77 S.Ct. 138, 1 L.Ed.2d 91 (1956)). As discussed above, Plaintiffs have failed to plead conspiracy with any specificity. In addition, Plaintiffs have failed to produce sufficient evidence to suggest that Vanderbilt Defendants' actions were taken because of Plaintiffs' race. As such, Vanderbilt Defendants' Motion to Dismiss with respect to Counts II and III is GRANTED.

## C. NEGLIGENCE

 Vanderbilt Defendants assert that the claim of negligence should be dismissed. Under Tennessee law, in order to recover under a theory of common law negligence, a plaintiff must establish the following elements:

> (1) a duty of care owed by the defendant to the plaintiff; (2) conduct falling below the applicable standard of care amounting to a breach of that duty; (3) an injury or loss;

---

**14.** As liability under Section 1986 is predicated on a violation of Section 1985, the elements required to state a claim under Section 1985 are necessarily required under Section 1986 as well.

*See* 42 U.S.C. § 1986 (applying to persons who have knowledge of "wrongs conspired to be done, and mentioned in section 1985").

(4) causation in fact; and (5) proximate, or legal, cause.

*McClenahan v. Cooley,* 806 S.W.2d 767, 774 (Tenn.1991). In the Complaint, Plaintiffs assert the following bases for their negligence claim:

> Defendants had a duty to make a reasonable inquiry to determine and/or investigate the causes of Baby Gregory's physical condition, for the purposes of determining the reasonableness of allegations of child abuse against Plaintiff parents. Defendants further had a duty to act in accordance with the Tennessee statutory guidelines concerning the conditions under which Baby Gregory was to be returned to his natural parents. Defendants further had a duty to ensure adequate health care for Baby Gregory while he was under foster care. Defendants further had a duty to honor the visitation privileges of Plaintiff parents while Baby Gregory was in the custody of the State of Tennessee.

With respect to the first allegation, that Defendants had a duty to make a reasonable inquiry regarding Gregory's physical condition prior to reporting a suspicion of child abuse, as discussed in the context of Vanderbilt Defendants' Motion for Partial Summary Judgment, Vanderbilt Defendants are entitled to immunity for such conduct. With respect to the remaining claims, these allegations concern the duties of DHS and other state actors. During oral argument, Plaintiffs assert that their negligence claim is based on conduct other than that stated above. However, the Court may consider only the allegations in the Complaint and evidence produced in support thereof. As such, the Court finds that Plaintiffs have failed to state a claim upon which relief may be granted with respect to this claim and, as such, Vanderbilt Defendants' Motion to Dismiss as to Count V is GRANTED.

### D. MALICIOUS PROSECUTION

Vanderbilt Defendants assert that the malicious prosecution should likewise be dismissed. Under Tennessee law, a private person "who takes an active part in continuing or procuring the continuation of criminal proceedings initiated by [herself or himself] or by another is subject to the same liability for malicious prosecution as if [he or she] had then initiated the proceedings." *Pera v. The Kroger Co.,* 674 S.W.2d 715, 722 (Tenn.1984) (quoting Restatement (Second) of Torts, § 655). However, where the instigator has no control over the case once the prosecution has begun, "[his or her] participation will not subject [him or her] to liability." *Id.* at 722–23. As noted in the Restatement (Second) of Torts as adopted by the Tennessee Supreme Court:

> [i]n order that there may be liability ..., the defendant must take an active part in their prosecution after learning that there is no probable cause for believing the accused guilty. It is not enough that he appears as a witness against the accused either under subpoena or voluntarily, and thereby aids in the prosecution of the charges which he knows to be groundless. His share in continuing the prosecution must be active, as by insisting upon or urging further prosecution. The fact that he initiated the proceedings does not make him liable ... merely because he intentionally refrains from informing a public prosecutor, into whose control the prosecution has passed, of subsequently discovered facts that clearly indicate the innocence of the accused, even though they have the effect of convincing him that this is the fact.

*Id.* (quoting Restatement (Second) of Torts, § 655 cmt. c). The Tennessee Supreme Court has also quoted favorably from Prosser on Torts, as follows:

> The Defendant may be liable either for initiating or for continuing a criminal prosecution without probable cause. But he cannot be held responsible unless he takes some active part in instigating or encouraging the prosecution. He is not liable merely because of his approval or silent acquiescence in the acts of another, nor for appearing as a witness against the accused, even though his testimony is perjured, since the necessities of a free trial demand that witnesses are not to be deterred by fear of tort suits, and shall be immune from liability. On the other hand, if he advises or assists another person to begin the proceeding, ratifies it when it is begun in his behalf, or takes any active

part in directing or aiding the conduct of the case, he will be responsible.

*Wykle v. Valley Fidelity Bank & Trust Co.,* 658 S.W.2d 96, 98 (Tenn.App.1983) (quoting Prosser on Torts, 4th Ed. p. 836).

In the present case, Plaintiffs assert that, as a direct and proximate result of Defendants' conduct, on February 9, 1995, an arrest warrant for Plaintiff Dr. Bryant–Bruce was issued, and she was arrested and incarcerated for approximately thirty hours. Moreover, on March 9, 1995, she appeared in Nashville, Tennessee, to face criminal charges of custodial interference, interstate flight, and fugitive from justice associated with the removal of Gregory to Egleston in Atlanta, Georgia. Plaintiff claims that, as Defendants knew that Dr. Cheryl Bryant–Bruce had never committed the crime of child abuse against Gregory, that no probable cause for the arrest warrant existed. Plaintiffs further assert that, since Plaintiffs were entitled to a second opinion as to Gregory's condition, no probable cause existed.

Even assuming that, as alleged by Plaintiffs, Vanderbilt Defendants knew that Dr. Cheryl Bryant–Bruce had never committed child abuse, Dr. Bryant–Bruce was not arrested for child abuse. According to the facts as stated in Plaintiffs' Complaint, she was arrested for abducting her child. Although Vanderbilt Defendants' alleged misdiagnosis of Gregory may have given Dr. Bryant–Bruce the motive for her actions, Plaintiffs have alleged no facts which would support their claim that Vanderbilt Defendants were even remotely involved in her arrest. Accordingly, Vanderbilt Defendants' Motion to Dismiss with respect to Count VI is GRANTED.

### E. ABUSE OF LEGAL PROCESS

██ Defendants assert that the abuse of legal process claim should likewise be dismissed. Under Tennessee law:

There are two tort actions that may be brought to obtain redress for the alleged misuse of legal process by another: abuse of process and malicious prosecution. An action for abuse of process lies for the use of legal process to obtain a result it was not intended to effect, for a wrongful purpose. Malicious prosecution, or the malicious use of process, is the employment of

legal process for its ostensible purpose, but without probable cause.

*Donaldson v. Donaldson,* 557 S.W.2d 60, 62 (Tenn.1977) (citations omitted). Again, Plaintiffs base their claim on the arrest of Dr. Bryant–Bruce for which, based on the facts as stated in the Complaint, Vanderbilt Defendants cannot be liable. Plaintiffs also assert an additional claim arising out of the testimony given by Vanderbilt Defendants at custody proceedings held on March 14, 1994, and on June 12, 1995. However, it is well established that "witnesses and other persons who are integral parts of the judicial process are entitled to absolute immunity." *Kurzawa v. Mueller,* 732 F.2d 1456, 1458 (6th Cir.1984). Accordingly, Vanderbilt Defendants' Motion to Dismiss with respect to Count VII is GRANTED.

### F. FALSE IMPRISONMENT

██ Defendants further assert that the false imprisonment claim should be dismissed. Under Tennessee law, false imprisonment is the intentional restraint or detention of another without just cause. *Newsom v. Thalhimer Bros., Inc.,* 901 S.W.2d 365, 367 (Tenn.Ct.App.1995). To recovery under a theory of false imprisonment, a plaintiff must demonstrate: 1) the restraint or detention of one against her will, and 2) the unlawfulness of such detention or restraint. *Id.* (citing *Coffee v. Peterbilt of Nashville, Inc.,* 795 S.W.2d 656, 659 (Tenn.1990)). The Tennessee Pattern Jury Instructions define false imprisonment as follows:

[T]he unlawful violation of the personal liberty of another. To constitute a false imprisonment there must be an intentional and unlawful restraint, confinement or detention which compels the person to stay or go somewhere against [her] will. The restraint necessary to constitute false imprisonment may result either from the exercise of force or from an express or implied threat of force. It is not necessary to constitute false imprisonment that there be confinement in a jail or prison.

Tenn.Pat.J.Instr. 8.10. Based on the allegations as contained in the Complaint, Plaintiffs' claim is based on the arrest of Dr. Cheryl Bryant–Bruce and as such, must be

dismissed. Accordingly, Vanderbilt Defendants' Motion to Dismiss with respect to Count VIII is GRANTED and this Count is DISMISSED.

### G. INVASION OF PRIVACY

■ Defendants assert that Plaintiffs cannot maintain a cause of action for invasion of privacy because Tennessee does not recognize such a cause of action based on the facts as stated in the Complaint. In *Brooks v. Collinwood Church of God,* No. N–37410, C.A. 846, 1989 WL 73232 (Tenn.Ct.App.1989), the Tennessee Court of Appeals stated that:

> A cause of action for "invasion of privacy" may arise from any of four distinct kinds of conduct: (1) intrusion into a person's physical solitude; (2) unwanted publicity placing a person in a false light; (3) appropriation of a person's likeness for commercial purposes; and (4) public disclosure of private facts. *See* Restatement (Second) of Torts, § 652A; Prosser, Torts § 117 (4th Ed.1971). The only one of the above types of conduct that has been recognized in Tennessee as giving rise to an invasion of privacy action is number (3) above.... [The court cannot find] any statute or decision of [the Tennessee] Supreme Court recognizing a cause of action for any other form of invasion of privacy.

*Id.* at *3. In the present case, the parties agree that the invasion of privacy claim asserted by Plaintiffs can be best characterized as a false light claim. While *Brooks* unequivocally rejects that such a claim may lie in Tennessee and held that an action may only lie for appropriation of a person's likeness, other courts have not limited recovery to this type of action. *See Int'l Union v. Garner,* 601 F.Supp. 187, 189 (M.D.Tenn.1985) (applying Prosser's description of invasion of privacy in interpreting Tennessee law as encompassing intrusion, public disclosure of private facts, false light and appropriation for commercial purposes); *Beard v. Akzona, Inc.,* 517 F.Supp. 128, 131 (E.D.Tenn.1981) (same); *Robinson v. Omer,* No. 01A01–9510–CV–00434, 1996 WL 274406, at *5 (Tenn.Ct.App. May 24, 1996) (recognizing public disclosure

of private facts under the Restatement approach); *Major v. Charter Lakeside Hosp., Inc.,* No. 42, 30011 T.D., 1990 WL 125538, at *4–5 (Tenn.Ct.App. Aug. 31, 1990) (same); *Gentry v. E. I. DuPont De Nemours & Co. Inc.,* No. 765, 1987 WL 15854, at *3–4 (Tenn. Ct.App. Aug.18, 1987) (same).

Even assuming that a cause of action for invasion of privacy is cognizable under Tennessee law, however, Plaintiffs have failed to allege facts in the Complaint which could support this claim. After a review of the facts as stated in the Complaint, Plaintiffs apparently are basing this claim on Vanderbilt Defendants' conduct in reporting the abuse to DHS and testifying at hearing regarding their allegations of abuse. As discussed above, Vanderbilt Defendants are entitled to immunity for such conduct. At oral argument, Plaintiffs did refer to March 1995 comments made by Dr. Oquist on the news program entitled "Day One" which aired on ABC, and a September 1, 1994, letter sent to Judge Weidemeyer by Nikki Oquist which attacked the character of Dr. Bryant–Bruce. However, these facts are not mentioned or even suggested in the Complaint. While the Court must construe the Complaint in the light most favorable to Plaintiffs, it cannot conjure up unpled facts.[15] As there are no facts in the Complaint which could support an invasion of privacy claim, Vanderbilt Defendants Motion to Dismiss with respect to Count IX is GRANTED.

### H. DEFAMATION

■ Defendants also claim that the defamation claim should be dismissed because it was insufficiently alleged in the Complaint, it is barred by the statute of limitations, and it is not defamatory, but is merely statements of opinion. In defining a cause of action for defamation of character, the Tennessee Supreme Court has adopted the standards enunciated in the Restatement (Second) of Torts which reads, in its relevant part, as follows:

> dants against which this action has been filed. As such, the Court is at a loss as to the claims against the remaining Defendants.

**15.** The Court also notes that the only statements referred to by Plaintiffs during oral argument are those statements allegedly made by Dr. Oquist. There is no mention of any of the other Defen-

§ 580B. *Defamation of a Private Person.* One who publishes a false and defamatory communication concerning a private person, or concerning a public official or public figure in relation to a purely private matter not affecting [his or her] conduct, fitness or role in [his or her] public capacity, is subject to liability, if, but only if, [he or she]

> (a) knows that the statement is false and that it defames the other,
>
> (b) acts in reckless disregard of these matters, or
>
> (c) acts negligently in failing to ascertain them.

*Trigg v. The Elk Valley Times,* 720 S.W.2d 69 (Tenn.Ct.App.1986) (quoting Restatement (Second) of Torts, § 580B). Libel involves written defamation while slander involves spoken defamation. *Quality Auto Parts Co., Inc. v. Bluff City Buick Co., Inc.,* 876 S.W.2d 818, 820 (Tenn.1994). A claim of damages for libel will not lie where the statements are expressions of opinion. As stated by the Tennessee Court of Appeals, "the First Amendment will not permit recovery in defamation for a statement which is the mere expression of an opinion and which does not assert by implication the existence of underlying false, defamatory facts." *Stones River Motors, Inc. v. Mid–South Pub. Co.,* 651 S.W.2d 713, 721 (Tenn.Ct.App.1983) (citing Restatement (Second) of Torts § 566 cmt. c (1977)). Actions for slander must be "commenced within six (6) months after the words are uttered." T.C.A. § 28–3–103. Actions for libel must be commenced within one year after the action has accrued. T.C.A. § 28–3–104.

■ In the present case, Plaintiffs assert that Vanderbilt Defendants caused the publication of untrue statements that Plaintiff parents committed the criminal act of child abuse. However, Plaintiffs have not alleged in this Court the specific statements made by Defendants that are alleged to be libelous. As was the case with their claim for invasion of privacy, Plaintiffs apparently base this claim on Vanderbilt Defendants' conduct in reporting the abuse to DHS and testifying at hearings regarding their allegations of abuse. As discussed above, Vanderbilt Defendants are entitled to immunity for such conduct. There are no other specific allegations in the Complaint to support Plaintiffs' claim for defamation. Moreover, those instances discussed during oral argument, such as the comments made by Dr. Oquist on the news program entitled "Day One", and the letter sent to Judge Weidemeyer, are likewise not contained in the Complaint. As there are no facts in the Complaint which could support a defamation claim, Vanderbilt Defendants' Motion to Dismiss with respect to Count X is GRANTED.

## I. OUTRAGEOUS CONDUCT

■ Defendants assert that Plaintiffs' claim based on the tort of outrageous conduct should be dismissed because the conduct complained of was insufficiently outrageous. Plaintiffs failed to rebut this argument. In order to state a claim for outrageous conduct, the conduct complained of must be extreme and outrageous. *Dunn v. Moto Photo, Inc.,* 828 S.W.2d 747, 752 (Tenn.Ct.App.1991) ("[T]he conduct complained of must have been outrageous, not tolerated in a civilized society, and ... as a result of the outrageous conduct, there must be serious mental injury."). In particular,

> [i]t has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct is characterized by 'malice', or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly [intolerable] in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous.'

*Scarborough v. Brown Group, Inc.,* No. 95–1150, 1995 WL 869586, at *6 (W.D.Tenn. Oct.31, 1995) (quoting *Dunn,* 828 S.W.2d at 751). In the present case, as discussed above, Vanderbilt Defendants cannot be held liable for their alleged misdiagnosis of Gregory. However, Plaintiffs have also alleged

that the physicians at Vanderbilt became aware that Plaintiff parents had not abused their child. Yet, according to Plaintiffs, Vanderbilt Defendants intentionally withheld this information knowing that this omission would result in the continuing deprivation of Plaintiff parents' custody of their child. Engaging in intentional conduct which results in the separation of a parent and child is sufficiently outrageous and shocking to state a claim under Tennessee law. Accordingly, Vanderbilt Defendants' Motion to Dismiss with respect to Count XI is DENIED.

### J. LOSS OF CONSORTIUM

 Defendants assert that Plaintiffs' loss of consortium claim should be dismissed because Tennessee does not recognize such a cause of action. Instead, Defendants assert that loss of consortium is merely an element of damages. Under Tennessee law, consortium is defined as "the conjugal fellowship of husband and wife, and the right of each to the company, cooperation, affection and aid of the other in every conjugal relation." *Jackson v. Miller*, 776 S.W.2d 115, 116 (Tenn.Ct.App.1989). While loss of consortium may be considered in computing damages arising from injury to a spouse, it is also a right of action separate from that of the spouse for damages. *Jackson*, 776 S.W.2d at 116. While recognizing that a spouse may bring a cause of action for loss of consortium of his or her spouse, Tennessee courts have not recognized a similar cause of action based on the relationship between a parent and a child. *See Still v. Baptist Hosp., Inc.*, 755 S.W.2d 807 (Tenn.Ct.App.1988). In the present case, Plaintiffs seek relief for the loss of consortium between a child and a parent. As Tennessee does not recognize this cause of action, Vanderbilt Defendants' Motion to Dismiss with respect to Count XII is GRANTED.

### VII. VANDERBILT DEFENDANT'S AMENDED MOTION TO DISMISS

Vanderbilt Defendants also filed an Amended Motion to Dismiss. In this Motion, Vanderbilt Defendants seek to clarify that their original Motion to Dismiss pertains to all causes of actions asserted by Plaintiffs with the exception of the fourth cause of action. Vanderbilt Defendants offer no new arguments or theories in support of their original Motion. The Court has already addressed the substance of Vanderbilt Defendants' claim as stated in the original Motion to Dismiss. Accordingly, Vanderbilt Defendants Amended Motion to Dismiss is DENIED as MOOT.

### VIII. CONCLUSION

For the foregoing reasons, the Motion to Dismiss filed by State Defendants, and the Motion to Dismiss filed by CSS Defendants are GRANTED, and these Defendants are DISMISSED, subject to a ruling by the Tennessee Court of Claims regarding whether the acts complained of were within the scope of employment of the Defendant actors as provided below. The Motion for Partial Summary Judgment and the Motion to Dismiss filed by Vanderbilt Defendants are GRANTED IN PART and DENIED IN PART as discussed herein, and the Amended Motion to Dismiss filed by Vanderbilt Defendants is DENIED as MOOT.

The State Defendants and CSS Defendants are dismissed with the proviso that, should the Tennessee Claims Commission determine that the acts of the employees involved were outside of the scope of their employment, Plaintiffs may file a motion within sixty (60) days of the dismissal of the state action requesting that their claims be reinstated on the federal district court's docket. Meanwhile, the statute of limitations on these causes of action by Plaintiffs will be tolled until a decision is rendered by the Tennessee Claims Commission.

Vanderbilt Defendants' Motion for Partial Summary Judgment is GRANTED for the actions taken in compliance with Defendants' duty to report suspicions of child abuse under Tennessee Code Annotated § 37–1–401 to 414, and DENIED to the extent that Defendants' actions were not taken pursuant to said legal duty or may have exceeded such duty as described herein.

Vanderbilt Defendants' Motion to Dismiss is GRANTED with respect to Counts I, II, III, V, VI, VII, VIII, IX, X and XII, and DENIED with respect to Counts XI.

## ORDER

Plaintiffs filed this Complaint pursuant to 42 U.S.C. § 1983, § 1985 and § 1986 alleging that Defendants violated their constitutional rights under the First, Fourth, Fifth, Eighth, Thirteenth and Fourteenth Amendments of the United States Constitution (Counts I, II & III). Plaintiffs also allege that they are entitled to damages under the following state law theories: professional negligence (Count IV), negligence (Count V), malicious prosecution (Count VI), abuse of legal process (Count VII), false imprisonment (Count VIII), invasion of privacy (Count IX), defamation of character (Count X), outrageous conduct (Count XI), and loss of consortium (Count XII).

For the reasons stated in the Memorandum filed contemporaneously entered herewith, the Motion to Dismiss (Docket Entry No. 46) filed by Defendants Tennessee Department of Human Services, Charles Wilson, Helen Allen, Steve Allen, Janice Robles and Brenda Stevenson ("State Defendants"), and the Motion to Dismiss (Docket Entry No. 50) filed by Defendants Nancy Salyer and Catholic Social Services ("CSS Defendants") are GRANTED, and these Defendants are DISMISSED, subject to a ruling by the Tennessee Court of Claims regarding whether the acts complained of were within the scope of employment of the Defendant actors as provided below. The Motion for Partial Summary Judgment (Docket Entry No. 23) and the Motion to Dismiss (Docket Entry No. 53) filed by Defendants the Vanderbilt University, Dr. Nikki Oquist, Dr. David Johnson, Dr. Noel Tulipan, Dr. Peter D'Sousa, Dr. Jeremy Garrett, Dr. Fayez Ghishan, Dr. Trent Wallace, Dr. Phillip McGaha, Dr. Joseph Gigante, Dr. Bradley Bullock and Dr. Steven Reilly[1] ("Vanderbilt Defendants") are GRANTED IN PART and DENIED IN PART as provided below, and the Amended Motion to Dismiss (Docket Entry No. 55) filed by Vanderbilt Defendants is DENIED as MOOT.

The State Defendants and CSS Defendants are dismissed with the proviso that, should the Tennessee Claims Commission determine that the acts of the employees involved were outside of the scope of their employment, Plaintiffs may file a motion within sixty (60) days of the dismissal of the state action requesting that their claims be reinstated on the federal district court's docket. Meanwhile, the statute of limitations on these causes of action by Plaintiffs will be tolled until a decision is rendered by the Tennessee Claims Commission.

Vanderbilt Defendants' Motion for Partial Summary Judgment is GRANTED for the actions taken in compliance with Defendants' duty to report suspicions of child abuse under Tennessee Code Annotated § 37–1–401 to 414, and DENIED to the extent that Defendants' actions were not taken pursuant to said legal duty or may have exceeded such duty as described in the Memorandum attached hereto.

Vanderbilt Defendants' Motion to Dismiss is GRANTED with respect to Counts I, II, III, V, VI, VII, IX, VIII, X and XII, and DENIED with respect to Counts XI.

Accordingly, this case will proceed with Counts IV and XI against Vanderbilt Defendants.

This case is hereby returned to the Magistrate Judge for further case management pursuant to Local Rule 11.

It is so ORDERED.

---

**1.** Defendants claim that Dr. Steven Reilly was erroneously identified as Dr. Timothy Reilly.