**A.C., by her next friend and Mother, J.C., her father, B.C., and J.C. and B.C., the parents, Individually, Plaintiffs,**

v.

**SHELBY COUNTY BOARD OF EDUCATION, Defendant.**

No. 2:10–cv–02347–V.

United States District Court, W.D. Tennessee, Western Division.

Nov. 1, 2011.

Jessica Farris Salonus, Jonathan L. Bobbitt, Justin Gilbert, Gilbert Russell McWherter PLC, Jackson, TN, for Plaintiffs.

Valerie B. Speakman, Memphis, TN, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

DIANE K. VESCOVO, United States Magistrate Judge.

In this lawsuit, filed on May 7, 2010, the plaintiffs, A.C., J.C., and B.C. (collectively referred to as "the plaintiffs"), allege that the defendant, the Shelby County Board of Education ("SCBE"), by and through its employees, unlawfully retaliated against the plaintiffs in violation of Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, and Title II of the American with Disabilities Act ("ADA"), 42 U.S.C. § 12203. The parties have consented to the jurisdiction of the United States Magistrate Judge. Before the court is SCBE's August 18, 2011 motion for summary judgment regarding the plaintiffs' claims. For the reasons that follow, the court finds no issues of material fact and that SCBE is entitled to judgment as a matter of law.

## I.  UNDISPUTED FACTS

For the purposes of the summary judgment motion, the court finds the following facts undisputed. A.C. is a former student of Bon Lin Elementary School ("Bon Lin"), a school operated by the SCBE. (D.E. 25, at 1.) A.C. is seven-years old and has Type 1 diabetes and a peanut allergy. (D.E. 25, at 5.) B.C. and J.C. are A.C.'s mother and father respectively. (D.E. 25, at 2.) While A.C. attended Bon Lin, Kay Williams ("Williams") was the principal and Tom McClellan ("McClellan") was the assistant principal and Section 504 coordinator. (D.E. 30-4, at 27–28; D.E. 30-5, at 20.)

In August 2007, before A.C. attended kindergarten, Bon Lin did not have a nurse on staff to care for a Type 1 diabetic child or a formal Individualized Health Plan ("IHP") to deal with A.C.'s medical condition. (D.E. 35-10, at 2–4.) To remedy this, A.C.'s parents tried to contact the Shelby County Health Department ("SCHD"), which provides nursing services to SCBE schools. (D.E. 35-10, at 2–3.) While a formal plan was not adopted, two SCHD nurses, Barbara Duddy ("Nurse Duddy") and Constance Brown ("Nurse Brown") visited the plaintiffs' home, which was the procedure for any new student with a disability. (D.E. 30-5, at 3.) J.C. requested several accommodations, including a full-time nurse for Bon Lin and that Bon Lin be a peanut-free school. (D.E. 30-5, at 3, 9.) At this meeting, it was also decided that J.C., who did not work outside of the home, would initially attend school with A.C. to familiarize the nursing staff with A.C.'s insulin pump. (D.E. 30-5, at 3, 9.)

As of August 13, 2007, SCHD school nurse assignments had already been made for the respective SCBE schools. (D.E. 30–5, at 9.) Prior to August 13, 2007, SCHD planned on placing a part-time nurse in Bon Lin; however, Maura Sullivan ("Sullivan"), the SCBE assistant superintendent, and the SCHD later came to an agreement to place a full-time nurse at Bon Lin. (D.E. 30–5, at 9.) When school began, no nurse had been officially assigned to the school. (D.E. 30–5. At 9; D.E. 35–10, at 2.) Until a nurse could be assigned to the school, two SCHD nurses, Nurse Duddy and Nurse Brown, were temporarily assigned to Bon Lin. (D.E. 30–5, at 9.) Unbeknownst to those at Bon Lin, J.C. filed a complaint with the Office of Civil Rights on August 21, 2007 because she believed that Bon Lin, SCBE, and the SCHD were not adequately responding to her requested accommodations for A.C. (D.E. 35–9, at 3.)

On August 22, 2007, Williams intended to leave a voicemail message for Nurse Duddy on her phone; however, Williams actually left the message on J.C.'s phone by accident. (D.E. 26, at 6.) The message was as follows:

> Hey, Barbara. I know we're having a meeting tomorrow about Ms. [C]. This is Kay Williams from Bon Lin. She is here causing all kinds of confusion and [A.C.'s teacher] has already broken down and cried. This woman is out to lunch. My teacher had ten minutes for lunch because she's trying to make sure there are no peanut people by her, and now she claims the kid did sit by her with peanut butter. I mean, yet she doesn't want the child sitting at another table because she doesn't want her singled out. I don't know what to do with this lady anymore. She does not reason or have any common sense. So you know that since I am the one with common sense, I am going to have a little problem with it. But at any rate, I love ya,

and I'll see you tomorrow, unless you want to call ... 937–3382. Bye.

(D.E. 26, at 6.) Williams stated in her deposition that this message was based upon her frustration with J.C. during the beginning of the school year. (D.E. 30–4, at 35–36.) Williams explained that, when she believed that an agreement concerning A.C.'s accommodations had been reached, J.C. would call and comment on the plan or change her expectations regarding the agreed-upon accommodations. (D.E. 30–4, at 35–36.)

On August 23, 2007, the day after Williams left the voicemail, a meeting was held to discuss J.C.'s and B.C.'s concerns about A.C.'s care while at school. (D.E. 30–4, at 55.) Present at the meeting were B.C.; J.C.; Angela Hargrave ("Hargrave"), SCBE's Section 504 coordinator; Williams; McClellan; A.C.'s kindergarten teacher; and Kathleen Johnston and Nurse Duddy from the SCHD. (D.E. 30–4, at 55.) At the meeting, Williams apologized twice for the voicemail. (D.E. 30–4, at 55–57.) The meeting was spent discussing A.C.'s peanut allergy and other accommodations that essentially made up the C.'s OCR complaint, including the issue of whether a full-time nurse would be on staff to assist A.C. (D.E. 30–4, at 55–57.) However, the C.'s OCR complaint, itself, was never specifically discussed or mentioned at this meeting. (D.E. 30–4, at 55–57.) J.C. and B.C. also again expressed they wanted Bon Lin to be a peanut-free school and any child that brought peanut products into the school to be disciplined. (D.E. 30–3, at 23; D.E. 30–5, at 21.) During this meeting, it was also settled that an IHP would be completed by August 27, 2007. (D.E. 30–5, at 26.) The SCHD nurses eventually presented J.C. with an IHP, but J.C. did not like the plan and wrote her own. (D.E. 35–9, at 2–3.)

On August 24, 2007, SCBE officially received notice of the C.'s OCR complaint. (D.E. 30–4, at 21.) This OCR complaint was handled internally by Sullivan, the SCBE assistant superintendent. (D.E. 30–4, at 21, 22.) Williams was not notified about the complaint until September 2007 and had no knowledge about the specifics of the complaint, SCBE's response to the complaint, or the final OCR resolution agreement that resulted from the C.'s complaint until this lawsuit was filed. (D.E. 30–4, at 34, 39, 40–42.)

In November 2007, a Section 504 meeting was held, and A.C.'s parents presented the SCBE with their parent-written IHP for A.C. (D.E. 30–5, at 22.) At this meeting, an agreement was also struck between the parties concerning the school's peanut policy. (D.E. 30–5, at 22.) The parties decided that Bon Lin would take several precautions to limit A.C.'s peanut exposure, including creating a peanut-free classroom; notifying the parents of A.C.'s classmates about A.C.'s allergy and the peanut-free classroom policy; monitoring the lunch room to make sure A.C. did not sit next to a student consuming peanut products; and having cafeteria employees wipe down all lunch tables before A.C.'s class arrived to eat lunch. (D.E. 30–5, at 22.) The parent-written plan was never signed by SCHD nurses.[1] At this meeting, B.C. expressed concerns about A.C.'s failure to master certain subjects, and the group discussed A.C.'s academic progress during her kindergarten year. (D.E. 30–2, at 29–30; D.E. 30–5, at 22.)

A.C.'s academic struggles continued into her first-grade year, and the school continued to provide health services for A.C. A.C.'s first-grade teacher was Laura Richardson ("Richardson"). (D.E. 30–3, at 31.) She spoke with J.C. about A.C.'s failing grades and inability to read. (D.E. 30–3, at 31–32.) Richardson was advised as to A.C.'s IHP plan for the 2008–09 year and went over the plan with J.C. (D.E. 30–4, at 17.) The IHP provided that A.C.'s blood glucose range should be between 70 and 170. (D.E. 30–3, at 34.) A.C. wore an insulin pump at school. (D.E. 30–4, at 15–16.) Richardson was to notify a school nurse when the device would alarm, which happened five times a day on average, but sometimes as many as ten times a day according to Richardson. (D.E. 30–4, at 16–20.) A.C. was only permitted to eat foods brought from home during the school day. (D.E. 30–3, at 33.) J.C. and B.C. determined how many carbohydrates A.C. would consume. (D.E. 30–2, at 19.) The school did not determine the amount of insulin A.C. would receive. (D.E. 30–2, at 18–19.) Although the basal rates on A.C.'s insulin pumps were initially determined by a physician, J.C. and B.C. would change those rates. (D.E. 30–2, at 18–19; D.E. 30–3, at 3.)

During the 2008–09 school year, Richardson developed a suspicion that A.C. was being medically abused because A.C. was bringing snacks from home with high sugar or high carbohydrate levels. (D.E. 30–4, at 11–12.) Richardson informed Williams of her suspicion and wanted to report A.C.'s parents to the Department of Children Services ("DCS"), but Williams informed Richardson not to do so because the school was working on building a relationship with A.C.'s parents. (D.E. 30–4, at 13–15.)

---

1. The record indicates that the nurses never signed-off on any parent-written IHP plan. The SCHD school health supervisor, Kathleen Johnston, testified in her affidavit that the only reason an IHP plan would ever be signed by a school nurse would be to indicate that it was nurse-drafted. (D.E. 38–16, at 3.) If the nurse did not draft the plan, then there would be no reason for the SCHD nurse to sign the plan.

A.C. began second grade in August 2009. (D.E. 30–5, at 11.) Her teacher was Amy Carver ("Carver"). (D.E. 30–5, at 11.) Carver was aware of the IHP plan for A.C. and informed the parents of A.C.'s classmates about A.C.'s peanut allergy and also placed a sign outside of the classroom informing others that the classroom was peanut-free. (D.E. 30–3, at 48–49.) A.C. entered second grade at a pre-primer basis, meaning her academic capabilities were at a kindergarten level. (D.E. 30–3, at 59.) During August, there were discussions between Shunji Brown–Woods ("Brown–Woods"), SCBE's director of coordinated health; Herschel Burton ("Burton"), then-acting SCBE superintendent; and McClellan about the possibility of placing A.C. in "homebound services." [2] (D.E. 35–15, at 30–32; D.E. 36–1, at 2.) This was suggested by McClellan because SCBE and SCHD did not have an updated health care plan signed by a physician. (D.E. 35–12, at 3.) SCBE did not immediately act on this plan, but the possibility for homebound services surfaced again in late October. (D.E. 35–12, at 4.) Ultimately, SCBE administrators rejected this plan, and the plaintiffs did not learn about SCBE's consideration of homebound services for A.C. until later during discovery. (D.E. 35–15, at 32; D.E. 38–1, at 14.)

On September 28, 2009, McClellan sent an email to Brown–Woods and Hargrave notifying them that he had received a new parent-written IHP. (D.E. 30–4, at 8.) There were mistakes, corrections, and changes to the plan that McClellan wanted to discuss with the family. (D.E. 30–4, at 8.) One of the parents' requests was for A.C. to not have her blood tested in the school's health clinic due to flu and germ concerns. (D.E. 35–11, at 3; D.E. 35–6, at 32–33.) A meeting was scheduled for October 27, 2009. (D.E. 30–5, at 23.) However, before the meeting and during the month of October 2009, A.C.'s glucose levels were outside the "target range" set forth in the parent-written IHP virtually every single school day. (D.E. 30–5, at 4, 23.) On October 27, 2009, McClellan sent an email to Brown–Woods in which he sent a copy of A.C.'s blood glucose monitoring logs for October.[3] (D.E. 30–5, at 23.) These logs showed that A.C.'s blood glucose levels were very erratic. (D.E. 30–5, at 23.) Carver was also concerned about A.C.'s erratic blood glucose levels. (D.E. 30–3, at 50.) Carver testified that, after monitoring A.C.'s glucose levels, she told her husband, a paramedic, about A.C.'s erratic levels occurring during school. (D.E. 30–3, at 50–51.) Carver's husband told Carver that the C.s were "lucky that their little girl is still living." (D.E. 30–3, at 51.)

On October 27, 2009, a Section 504 meeting was held to discuss A.C. (D.E. 35–11, at 3.) At this meeting, Carver discussed her concern about A.C.'s academic progress. (D.E. 30–5, at 23.) Based upon A.C.'s low proficiency scores, McClellan suggested that A.C. be tested for a learning disability. (D.E. 30–5, at 23.) This

2. Homebound is a service where students are still enrolled in school, but stay at home. (D.E. 35–15, at 16–17.) This service is provided to students who "have a medical/fragile issue" that keeps them from attending school. (D.E. 35–15, at 16–17.)

3. The plaintiffs in their response to SCBE's statement of undisputed facts argue that SCBE cannot rely on these glucose logs because much of this information was learned during discovery. (D.E. 35–1.) However, the record demonstrates that SCBE administrators and staff were aware of A.C.'s glucose levels before litigation began. The record reveals that Nurse Brown and Carver both kept logs of A.C.'s blood glucose levels and, as McClellan's email to Brown–Woods demonstrates, that Nurse Brown shared information concerning A.C.'s glucose levels with Bon Lin administrators. (D.E. 30–3, at 50–51; D.E. 30–5, at 2, 4, 22, 23; D.E. 38–1, at 20.)

was rejected by the parents, and A.C. was not tested. (D.E. 30–5, at 23; D.E. 35–5, at 25–26.) At this meeting, according to Nurse Brown's logs, the C.s also requested that A.C.'s glucose levels be tested in the classroom, and not the clinic. (D.E. 36–12, a 2.) On October 28, 2009, the day after this meeting, Nurse Brown was informed by J.C. that there was to be no testing in the clinic. (D.E. 36–12, at 2.) Nurse Brown was displeased with this requested accommodation because she believed the clinic to be the appropriate place for testing A.C.'s blood glucose levels. (D.E. 37–1, at 22–23; D.E. 38–12, at 7.) Nurse Brown wrote in her nursing log that "students in her class may be ill." (D.E. 36–12, at 2.) Nurse Brown also wrote in her log "If such problem, may need to reconsider school itself!" (D.E. 36–12, at 2.) Additionally, Nurse Brown noted that she asked if she could call A.C.'s endocrinologist to discuss if this accommodation was necessary. (D.E. 36–12, at 2.) Her logs for October 28, 2009 reveal that she was advised not to call A.C.'s doctor.[4] (D.E. 36–12, at 2.) The C.s were not aware of Nurse Brown's log until discovery. (D.E. 38–12, at 4–12.)

On October 29, 2009, B.C. had a thirty-minute meeting with McClellan. (D.E. 35–12, at 9; D.E. 35–13, at 2.) B.C. again requested that there be no testing in the clinic because A.C. had an open wound. (D.E. 36–12, at 2.) This request was also related to Nurse Brown, who made a notation in her personal log. (D.E. 36–12, at 2.)

On October 30, 2009, at approximately 9:25 A.M., Carver notified Nurse Brown that A.C. was "feeling low." (D.E. 30–5, at 4.) Nurse Brown went to the classroom and tested A.C.'s blood glucose level and found it to be low–approximately forty-eight. (D.E. 30–5, at 4.) Nurse Brown

informed Carver that they were lucky A.C. "had not passed out." (D.E. 30–5, at 5.) With this news, Carver became very stressed and began to hyperventilate. (D.E. 30–3, at 53.) Carver, who was pregnant at the time, was fearful that the stress related to caring for A.C. would jeopardize her pregnancy. (D.E. 30–3, at 53; D.E. 30–5, at 5.) Carver went to Williams's office. (D.E. 30–3, at 54.)

While at Williams's office, Nurse Brown took Carver's blood pressure and placed cold towels on her forehead and neck to calm her. (D.E. 30–5, at 5.) Carver expressed concerns about A.C.'s fluctuating glucose levels. (D.E. 30–5, at 5.) By this point, Nurse Brown had also, on multiple occasions, reported to Williams that something must be wrong for A.C.'s glucose levels to be so erratic. (D.E. 30–5, at 4.) It was at this time that Williams considered contacting DCS. (D.E. 36–13, at 2.)

And at that time, Williams's concerns about reporting suspicions of medical abuse were heightened due to a recent SCBE principals' meeting that was held on October 6, 2009, which she and Hargrave both attended. (D.E. 30–4, at 51; D.E. 30–5, at 17.)

At the principals' meeting, the SCBE superintendent discussed with the principals recent criminal charges that were filed against a local Memphis City School principal for failure to report child abuse. (D.E. 30–5, at 17.) At the meeting, principals were reminded about their state law requirement to report suspicions of any kind of abuse and were warned about the consequences of not reporting. (D.E. 30–5, at 17–18.) A DVD was distributed at the meeting in which Shelby County District Attorney Bill Gibbons stressed the importance of reporting suspected abuse.

4. The record also reflects that J.C. made the no-contact decision for nurses and A.C.'s doctors as early as November 2007. (D.E. 35–5, at 17; D.E. 38–2, at 9.)

(D.E. 30–5, at 17–18.) In the DVD, Gibbons stated, "Failure to report ... is a crime under Tennessee Law" and also instructed, "Do not attempt to investigate the incident yourself" and that, "It is not your job to verify that the incident is true." (D.E. 30–5, at 18.)

Ultimately, in response to the Carver incident, Williams sent an email to Hargrave on October 30, 2011, documenting what had occurred and asking Hargrave for advice. (D.E. 30–5, at 18; D.E. 36–13, at 2.) The email stated that Carver was concerned about A.C.'s "roller coaster" levels. (D.E. 36–13, at 2.) The email also stated that Williams was "very concerned" about the health of the child and that she was ready to make a DCS report. (D.E. 36–13, at 2.) Hargrave then contacted a DCS supervisor and described A.C.'s fluctuating glucose levels, without mentioning A.C.'s, J.C.'s, or B.C.'s names. (D.E. 30–5, at 18.) The DCS supervisor informed Hargrave that the school district employees were obligated to report this incident. (D.E. 30–5, at 18.) Hargrave informed Williams of her conversation with the DCS supervisor, and Williams filed a written report with DCS. (D.E. 30–5, at 18; D.E. 35–7, at 50.) In the report, Williams stated that she was afraid that A.C. would die at school because A.C. was having high sugar levels followed by sudden crashes almost everyday. (D.E. 37–5, at 8.)

On the night of October 30, 2009, DCS began an investigation by visiting the plaintiffs' home. (D.E. 37–5, at 23.) DCS met with the family again on November 4, 2009. (D.E. 37–5, at 35.) DCS conducted another home visit on November 12, 2009 after speaking with Williams on November 11, 2009. (D.E. 37–5, at 41.) DCS conducted a final family interview on December 8, 2009, and the case was ultimately closed as "unfounded due to the evidence not supporting the allegations" on December 14, 2009. (D.E. 37–51, at 40–41.) The

C.s withdrew A.C. from Bon Lin prior to the 2010–2011 school year and filed this lawsuit on May 10, 2010, alleging that several of SCBE's actions amount to unlawful retaliation in violation of both Section 504 and the ADA. (D.E. 25.)

## II. ANALYSIS

### A. Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, the discovery and disclosure of materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c); *see also LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir.1993); *Osborn v. Ashland County Bd. of Alcohol, Drug Addiction & Mental Health Servs.*, 979 F.2d 1131, 1133 (6th Cir.1992) (per curiam). The moving party has the burden of showing that there are no genuine issues of material fact in the case. *LaPointe*, 8 F.3d at 378. This may be accomplished by pointing out to the court that the non-moving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989).

In response, the non-moving party must go beyond the pleadings and present significant probative evidence to demonstrate that there is more than "some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir.1993); *see also LaPointe*, 8 F.3d at 378. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106

S.Ct. 2505, 91 L.Ed.2d 202 (1986); *La-Pointe,* 8 F.3d at 378.

In deciding a motion for summary judgment, the "[c]ourt must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir.1993) (quoting *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505). The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the non-moving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Patton,* 8 F.3d at 346; *60 Ivy St. Corp. v. Alexander,* 822 F.2d 1432, 1435 (6th Cir.1987). However, to defeat a motion for summary judgment, "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *LaPointe,* 8 F.3d at 378. Finally, a court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *Adams v. Metiva,* 31 F.3d 375, 379 (6th Cir.1994).

**B.** *Retaliation Claims under the ADA and Rehabilitation Act*

The plaintiffs seek relief for SCBE's alleged retaliation under both the ADA and Section 504 of the Rehabilitation Act. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities

of a public entity." 42 U.S.C. § 12132. The anti-retaliation provision of Title II of the ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this Act. 42 U.S.C. § 12203; 28 C.F.R. 35.134. Section 504 of the Rehabilitation Act provides that "no otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). It is illegal to "discharge, intimidate, retaliate, threaten, coerce or otherwise discriminate against any person" for seeking to enforce Section 504. 29 C.F.R. § 33.13.

■ It is settled in the Sixth Circuit that the two statutes are similar in purpose and scope and that the analysis of claims under the ADA "roughly parallels those brought under the Rehabilitation Act." *Monette v. Electronic Data Sys. Corp.,* 90 F.3d 1173, 1177 (6th Cir.1996). Moreover, "the [ADA] standards apply in Rehabilitation Act cases alleging employment discrimination." *Burns v. City of Columbus,* 91 F.3d 836, 842 (6th Cir.1996). Because the standards under both acts are similar, cases construing one statute are instructive in construing the other. *Andrews v. State of Ohio,* 104 F.3d 803, 807 (6th Cir.1997). Therefore, the court will consider the plaintiffs' retaliation claims under both statutes together.

■ To state a claim under either statute, the plaintiff must (1) be disabled as defined by the statutes; (2) be otherwise qualified for participation in the program; (3) have been discriminated against on the basis of their disability. *McPherson v. Michigan High Sch. Athletic Assoc., Inc.,* 119 F.3d 453, 460 (6th Cir.1997).[5] The

---

5. Under Section 504, the plaintiffs must further allege that the program receives federal

funds; however, the parties do not dispute this fact. *See Andrews,* 104 F.3d at 807.

parties here disagree about the third prong: whether A.C. was discriminated against based on her disability. The plaintiffs allege that SCBE violated Section 504 and the ADA by retaliating against the plaintiffs for engaging in protected activity.

■ To state a prima facie case for retaliation, the plaintiffs must establish that (1) they were engaged in a legally protected activity; (2) the defendant knew about the plaintiffs' exercise of this right; (3) the defendant took an action adverse to the plaintiffs; and (4) the protected activity and the adverse action are causally connected. *Gribcheck v. Runyon*, 245 F.3d 547, 551 (6th Cir.2001); *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir.2000); *Wrenn v. Gould*, 808 F.2d 493 (6th Cir.1987). To satisfy the causation requirement, the plaintiffs must produce sufficient evidence from which an inference could be drawn that the alleged actions would not have been taken had the plaintiffs not engaged in protected activity. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir.2000) (discussing a Title VII retaliation claim).

■ If the plaintiff establishes a prima facie case of retaliation, the burden then shifts to the defendant to put forth a legitimate, non-discriminatory reason for the adverse action. *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir.1997). If the defendant establishes an alternative, permissible justification, then the plaintiff must prove by a preponderance of evidence that the defendant's explanation is a mere pretext for its discriminatory motive. *Id.* Pretext can be established by demonstrating "that the asserted reasons had no

basis in fact, the reasons did not in fact motivate the [adverse action], or, if they were factors in the decision, they were jointly insufficient to motivate the [adverse action]." *Sudekamp v. Fayette County Bd. of Educ.*, No. Civ.A. 04–467–JBC, 2005 WL 2137739, at *3 (E.D.Ky. Sept. 1, 2005) (quoting *Maddox v. Univ. of Tenn.*, 62 F.3d 843, 848 (6th Cir.1995)).

The plaintiffs allege that SCBE retaliated against them in several ways[6]: (1) SCBE principal Williams accidently left a disparaging voicemail on J.C.'s phone; (2) SCBE reacted negatively when the plaintiffs brought up concerns; (3) SCBE suggested that A.C. be tested for a learning disability; (4) SCBE's school administrators refused to keep all peanut products out of the classroom; (5) SCBE considered "homebound services" for A.C.; (6) SCHD nurses were resistant to plaintiffs' requests to test A.C.'s glucose levels in the classroom; and (7) SCBE principal Williams filed a complaint with the DCS, which the plaintiffs allege contained various false statements. (D.E. 25; D.E. 35, at 16; D.E. 35–1, at 39.) The court will address each alleged retaliatory act in turn.

1. *Williams's Voicemail*

■ In the complaint, the plaintiffs argue that Williams, an SCBE employee and principal of Bon Lin, retaliated against the plaintiffs by leaving a disparaging voicemail after they had filed a complaint with the OCR. In response, SCBE argues that the August 22, 2007 voicemail message can not be considered retaliatory because Williams was not aware that the plaintiffs had filed their OCR complaint until September of 2007.[7] The court agrees with SCBE on this claim.

6. Some of these claims were initially alleged in the plaintiffs' complaint, while several other claims—SCBE's "negative reactions" to plaintiffs' concerns, SCBE's suggestion that A.C. be tested for a learning disability, SCBE's consideration of homebound services

for A.C., and SCHD's nurse's resistance to classroom glucose testing—were first identified by the plaintiffs during their depositions.

7. SCBE also argues that the court should not consider the voicemail because the statute of

To establish that this voicemail was retaliatory, the plaintiffs must show that SCBE knew and acted *because* the plaintiffs engaged in protected activity. *Thaddeus X v. Blatter*, 175 F.3d 378, 387 (6th Cir.1999). If Williams was unaware that the OCR complaint had been filed at the time she left the voicemail message, it would be impossible for her to have retaliated *because of* protected activity.

■ To show that Williams knew of the OCR complaint at the time she left the voicemail, the plaintiffs offer an August 21, 2007 email from Hargrave to SCBE administrators and SCHD nurses, in which Williams was CC'd, that mentioned J.C. "will file a complaint with OCR if ... her daughter's needs are not met" to establish knowledge and causation.[8] (D.E. 35–8, at 2.) However, this email only establishes that Williams knew that there was a *possibility* the plaintiffs *may* engage in protected activity. Indeed, the plaintiffs offer no proof to refute the fact that Williams did not become aware of the OCR complaint until September 2007. (D.E. 30–4, at 34, 39, 40–42.)

The plaintiffs also argue that Williams should be charged with knowledge of the OCR complaint because she was aware of the substance of the complaint. (D.E. 35–1, at 5–7.) Plaintiffs argue that, in addition to being CC'd on the August 21, 2007 email, Williams was present at a meeting held on August 23, 2007, where the parties discussed the plaintiffs' requested accommodations, which essentially formed the basis of the plaintiffs' OCR complaint. (D.E. 35–1, at 5–7.) But this meeting was held on August 23, 2007, the day *after* Williams unintentionally left the voicemail message on August 22, 2007. Additionally, the record does not show that the OCR complaint was ever *actually* discussed at the meeting. It is therefore illogical to assert that Williams acted *because of* an OCR complaint, which was *not* even specifically mentioned at a meeting that occurred *after* Williams left the voicemail.

The court also notes that Williams did not make a conscience decision to leave the voicemail, and the parties do not dispute that the voicemail was accidently left. So, it cannot be said that Williams would not have left the voicemail had the plaintiffs not engaged in protected activity. *See Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir.2000). Thus, this voicemail, as a matter of law, cannot be considered an act of retaliation. SCBE is entitled to summary judgment on this alleged act of retaliation.

### 2. *SCBE's Negative Reactions to Plaintiffs' Concerns*

This claim was brought out in J.C.'s deposition. However, it is not clear exactly what "negative reactions" J.C. was referring to, and the plaintiffs do not dispute SCBE's arguments as it pertains to this specific allegation. Thus, the court grants summary judgment on this alleged act of retaliation.

---

limitations period has expired. The plaintiffs respond that the voicemail is a part of a "continuing act of retaliation" and thus outside of the limitations period. The court need not address whether this is a discrete or part of a continuing act because this voicemail, as a matter of law, was not retaliatory.

8. The court notes that temporal proximity alone is usually insufficient to establish causation. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir.2000). Thus, the plaintiffs' claim cannot rest solely on the fact that Williams's voicemail was left only one day after the plaintiffs' OCR complaint was filed. There must be sufficient evidence to support a finding that the protected activity and the adverse action were connected. *Id.* at 566.

### 3. *SCBE's Suggestion that A.C. be Tested for a Learning Disability*

■■■ This claim was also brought out during depositions. (D.E. 30–3, at 20.) SCBE argues that its suggestion that A.C. be tested for a learning disability cannot be considered retaliatory because it was not an adverse action and because the plaintiffs cannot establish a causal connection between the suggestion and any alleged protected activity. Specifically, SCBE argues that (1) the plaintiffs did not suffer an adverse action because A.C. was not actually tested; (2) that school districts have a legal obligation to identify students and test them for disabilities; and (3) that it is impossible to say that SCBE did not have a legitimate, nondiscriminatory reason for acting because A.C. was behind academically. (D.E. 30–1, at 26.) The plaintiffs do not dispute any of these arguments. The plaintiffs state only in response that the parents actually would consider testing A.C. for learning disability but decided to reevaluate the issue at a later date. (D.E. 35–1, at 18.) In light of these facts and SCBE's undisputed arguments, SCBE is entitled to summary judgment on this claim of retaliation.

### 4. *SCBE's Failure to Ban All Peanut Products in School*

■■■ This alleged retaliatory act was first mentioned in the plaintiffs' complaint and was also acknowledged by J.C. in her deposition. (D.E. 25, at 9; D.E. 30–3, at 18–21.) SCBE argues that the decision to not implement a school-wide peanut ban was not retaliatory because SCBE took several precautions to limit A.C.'s peanut exposure, including creating a peanut-free classroom; notifying the parents of A.C.'s classmates about A.C.'s allergy and the peanut-free classroom policy; monitoring the lunch room to make sure A.C. did not sit next to a student consuming peanut products; and having cafeteria employees wipe down all lunch tables before A.C.'s class arrived to eat lunch. (D.E. 30–1, at 27.) The plaintiffs did not respond to SCBE's arguments on this issue in their response and appeared to have dropped the argument altogether. The court finds the facts are undisputed and that SCBE's refusal to ban peanut products school-wide was not retaliatory as a matter of law. SCBE is entitled to summary judgment on this alleged retaliatory act and claim.

### 5. *SCBE's Consideration of "Homebound Services" for A.C.*

■■■ Plaintiffs also claim that SCBE's consideration of homebound services for A.C. was a retaliatory act. (D.E. 38–1, at 14.) Homebound services were originally suggested by Brown–Woods, the director of coordinated school health, and later supported by Burton, the SCBE superintendent. (D.E. 35–15, at 31–32; D.E. 36–1, at 1–2.) Brown–Woods then advised assistant principal McClellan to set up A.C. for homebound services. (D.E. 36–1, at 2.) SCBE did not immediately act on this plan, and the possibility for homebound services for A.C. surfaced again in late October. (D.E. 35–12, at 4.) But this plan was ultimately rejected, and the plaintiffs did not learn about the plan until discovery. (D.E. 35–15, at 32, D.E. 38–1, at 14.) Because the plaintiffs only learned of SCBE's consideration of homebound services during discovery, this action cannot be considered adverse as a matter of law. An adverse action is conduct that "would deter a person of ordinary firmness from continuing to engage" in protected activity. *Tucker v. City of Richmond,* 388 F.3d 216, 220 (6th Cir.2004). If the plaintiffs were unaware of SCBE's consideration of homebound services for A.C., it cannot be said that such action would deter the plaintiffs from engaging in protected activity. *See id.* Therefore, SCBE's action cannot be deemed retaliatory, and

SCBE is entitled to summary judgment on this alleged act of retaliation.

### 6. SCHD's Resistance to Classroom Glucose Testing

■ The plaintiffs also assert that SCHD Nurse Brown's actions after accommodation requests for classroom glucose testing were made on October 28 and 29, 2009 should be considered a retaliatory act of SCBE. Nurse Brown is not a SCBE employee, but a SCHD employee. Instead, she contractually provides her services to SCBE schools through the SCHD.[9]

At the October 27, 2009 meeting, J.C. requested that A.C. have her insulin tested in the classroom and not the health clinic because sick children and adults were treated in that clinic. (D.E. 36–12, at 2; D.E. 38–1, at 14–15.) J.C. also wrote a handwritten request for the accommodation to Nurse Brown. (D.E. 36–12, at 2; D.E. 38–1, at 15.) Nurse Brown received the parents' request, affixed it to her nursing notes on October 28, 2009, and wrote beside it, "If such problem may need to reconsider school itself." (D.E. 36–12, at 2; D.E. 38–12, at 6–7.) Plaintiffs also note that Nurse Brown stated she was not happy with the plaintiffs' requested accommodations and also never signed off on the plan. (D.E. 37–1, at 22–23.)

In response, SCBE maintains that Nurse Brown's actions cannot be considered retaliatory because the plaintiffs suffered no adverse action. Indeed, like the consideration of homebound services, the plaintiffs only learned of Nurse Brown's personal notes stating "reconsider school

itself" during discovery. (D.E. 38–12, at 4–12.) Again, an adverse action is conduct of the defendant that would "deter a person of ordinary firmness from continuing to engage" in protected activity. Tucker v. City of Richmond, 388 F.3d 216, 220 (6th Cir.2004). Because the plaintiffs were unaware of Nurse Brown's notes and attitudes until discovery in this lawsuit, these actions are not retaliatory as a matter of law. SCBE is entitled to summary judgment on this claim of retaliation as well.

### 7. Williams's DCS Report

■ Finally, the court turns to the plaintiffs' claim that Williams's October 30, 2009 DCS report was retaliatory. To establish their claim, the plaintiffs must first show that they engaged in protected activity. In support, the plaintiffs offer several actions dating back to 2007,[10] but most notably requests for accommodations to test A.C.'s glucose levels in the classroom that were made on October 28 and 29, 2009, which were made immediately before Williams's DCS report. (D.E. 35–7, at 50; D.E. 35–13, at 2; D.E. 36–12, at 2.) The parties dispute whether the plaintiffs' October 28 and 29, 2009 requests for accommodations for classroom diabetic testing would qualify as a protected activity.

The Sixth Circuit has not yet answered the question of whether requests for accommodations are protected activities. However, at least six other circuits have addressed this issue, as well as the Northern District of Ohio within this circuit. See, e.g., Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 106 (1st Cir.2007) ("Requesting an accommodation is protect-

9. The parties dispute whether SCBE is liable for the actions of SCHD nurses. The court finds it unnecessary to address the issue of liability because Nurse Brown's actions do not amount to unlawful retaliation.

10. The plaintiff insists that the court should consider many other requests that occurred

from 2007 to 2009. (D.E. 35, at 11.) However, because the court finds the requests made on October 28 and 29, 2009 to be protected activities for purposes of establishing a prima facie case, the court finds it unnecessary to engage in a lengthy analysis of the other proffered protected activities.

ed conduct for purposes of the ADA's retaliation provision."); *Mayers v. Laborers' Health & Safety Fund of N. Am.*, 478 F.3d 364, 369 (D.C.Cir.2007) (recognizing a request for reasonable accommodations for arthritis as protected conduct); *Cassimy v. Bd. of Educ. of Rockford Pub. Sch.*, 461 F.3d 932, 938 (7th Cir.2006) (finding that requesting an accommodation is protected activity); *Heisler v. Metro. Council*, 339 F.3d 622, 632 (8th Cir.2003) ("Requesting an accommodation is a protected activity" under the ADA); *Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 706 n. 3 (4th Cir.2001) (finding that plaintiff's request for an accommodation provides grounds to establish a retaliation claim); *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1266 (10th Cir.2001) (affirming summary judgment for the defendant because plaintiff failed to establish causation between adverse employment action and request for reasonable accommodation under the ADA); *Garcia v. Third Federal Sav. and Loan Ass'n of Cleveland*, No. 1:06–cv–1990, 2007 WL 1235820 (April 26, 2007 N.D.Ohio); *Kovac v. Lowe's Home Ctrs., Inc.*, No. 5:05–CV–2276, 2006 WL 1644336, 2006 U.S. Dist. LEXIS 37214 (June 7, 2006 N.D. Ohio) (finding that plaintiff engaged in a protected activity by requesting reasonable accommodation under the ADA).

■ This court recognizes, as has every circuit court of appeals to have considered the issue, that requests for accommodations under the ADA are protected activities. Accordingly, the court finds that the plaintiffs' October 28 and 29, 2009 requests for accommodations would qualify as protected activities. *See Garcia*, 2007 WL 1235820, at *6. SCBE was undoubtedly aware of these requests because they were made during a meeting between the plaintiffs and assistant principal McClellan. (D.E. 35–12, at 7–8.) Thus, plaintiffs have established the first and second prongs of their prima facie case.

■ Next, the plaintiffs must establish that they suffered an adverse action. Both parties dispute whether Williams's report to DCS can be considered an adverse action. SCBE maintains that, as a matter of law, a report to DCS cannot be considered an adverse action because the report is protective, and not disciplinary, in nature. (D.E. 38, at 17.) In support, SCBE cites *Cox v. Warwick Valley Central Sch. Dist.*, 654 F.3d 267 (2nd Cir. 2011).

In *Cox*, the Second Circuit held that school administrators' reports to child protective services are not adverse actions unless there is a "clear showing of retaliatory or punitive intent" for making the report. *Id.* at 274. In this decision, the Second Circuit relied on New York's reporting statutes, N.Y. Soc. Serv. Law §§ 413(a), 419, and 420, in coming to their conclusion. The Second Circuit noted that the New York statutes showed that the states "confer[ ] immunity from civil and criminal liability whenever [administrators] report suspected abuse in good faith, and it exposes them to criminal and civil liability whenever they willfully fail to do so." *Id.* at 273. The court reasoned that these statutes show a "powerful" state interest in encouraging teachers to protect students. *Id.* Because of this powerful state interest, administrators' decisions are entitled to "unusual deference," and without a clear showing of retaliatory or punitive intent, such reports cannot be considered adverse or retaliatory. *Id.* at 274. The court further reasoned that any other conclusion would place school administrators "in an impossible bind" where they would have to choose between facing civil liability for reporting suspicions of abuse or risk injury to the child. *Id.* In conclusion, the Second Circuit stated, "Allowing such reports to generally constitute retaliation against the *children* would seriously

undermine school administrators' ability to protect the children entrusted to them." *Id.* at 275.

In their response, the plaintiffs cite *Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580 (6th Cir.2008) for the proposition that false reports to protective services can be retaliatory. This case actually involved a consolidated appeal of two retaliation claims of two separate plaintiffs, Mulkey and Jenkins, filed against a school board in Ohio. *Id.* at 583–85. In the Mulkey part, a school nurse contacted children's services to report possible neglect because a child was sick from blood-sugar issues and because the child was running low on supplies, which the parent was supposed to provide to the school. *Id.* at 585. Children's services interviewed the plaintiffs and then closed the case. *Id.* The district court granted summary judgment in favor of the superintendent on this claim, and the Sixth Circuit affirmed the district court's ruling. *Id.* at 589.

In the Jenkins part, the Sixth Circuit reversed the district courts ruling of summary judgment in favor of the school administrators. *Id.* at 592. On this claim, the Jenkins plaintiff filed complaints against the superintendent with the OCR and the Department of Education. *Id.* at 584–85. Within one week of the plaintiff's OCR complaint, the superintendent told the plaintiff, "you contacted the Office of Civil Rights and got an investigation started, so I figured I'd start one of my own." *Id.* at 584. And within two days of the plaintiff's Department of Education complaint, the superintendent made a call to children's services. *Id.* Thus, it was evident that the school administrator harbored retaliatory intent against the plaintiff.

The court finds the *Cox* case persuasive authority on this issue. Like the New York provisions, Tennessee's statutes on reporting child abuse and neglect also demonstrate a powerful interest in encouraging teachers to take steps to protect students. Indeed, TENN.CODE ANN. § 37–1–403 *requires* school representatives to immediately report any suspicions of abuse or neglect. Additionally, as noted by SCBE in their motion for summary judgment, TENN.CODE ANN. § 37–1–410 provides immunity to those who make DCS reports in good faith. (D.E. 30–1, at 23, fn. 11.) Section 37–1–410(a)(5)(A) states in relevant part as follows:

> IF, acting in good faith, the person makes a report of harm, as required by § 37–1–403; THEN
>
> The person shall not be liable in any civil or criminal action that is based solely upon:
>
> (i) The person's decision to report what the person believed to be harm;
>
> (ii) The person's belief that reporting the harm was required by law; or
>
> (iii) The fact that the report of harm was made.

TENN.CODE ANN. § 37–1–410(a)(5)(A). In subsection (a)(5)(B), the statute also states, "[b]ecause of the overriding public policy to encourage all persons to report the neglect of or harm or abuse to children, any person upon whom good faith immunity is conferred pursuant to this subdivision (a)(5) *shall be presumed to have acted in good faith in making a report of harm.*" TENN.CODE ANN. § 37–1–410(a)(5)(B)(emphasis added). Moreover, cases construing Tennessee's child abuse and neglect reporting provisions also demonstrate that plaintiffs must demonstrate defendants "acted in bad faith by clear and convincing evidence" in making their reports. *See Bryant–Bruce v. Vanderbilt Univ., Inc.*, 974 F.Supp. 1127, 1139–1141 (M.D.Tenn. 1997).[11] Thus, this court finds that

11. The district court in *Bryant-Bruce* was in-   terpreting an earlier version of TENN.CODE ANN.

Williams's decision to make a DCS report is entitled to deference, and Williams and SCBE are also entitled to a presumption that Williams's DCS report was made in good faith. Accordingly, Williams's report to DCS cannot be deemed an adverse or retaliatory act unless the plaintiffs make a showing, by clear and convincing evidence, that Williams harbored a retaliatory or punitive intent when making the report. The plaintiffs fail to do so.

The plaintiffs cite several acts[12] to demonstrate SCBE's and Williams's discriminatory intent for making the DCS call. (D.E. 35, at 16.) These alleged acts include (1) "plotting" to place A.C. in homebound; (2) SCHD nurse stating "reconsider the school itself"; (3) Williams embellishing teacher's attack; (4) SCHD nurse lying about her involvement with DCS; (5) Williams lying about no testing at home; (6) SCBE principal Williams and SCHD Nurse Brown lying about parents wanting to kill child; (7) relying on "erratic" glucose levels that occurred at school and not at home; (8) and SCBE's refusal to train nurses. (D.E. 35, at 16–17.) SCBE disputes most of these allegations, claiming that the record does not support these claims. With some acts the court agrees with SCBE, specifically nowhere in the record do Williams or Nurse Brown ever state the parents "wanted to kill their child." Also, the plaintiffs' claims that SCBE and SCHD staff lied grossly exaggerates the record before the court. However, two acts offered by the plaintiff as evidence of discriminatory in-

tent are not disputed by SCBE: SCHD Nurse Brown's statement regarding classroom testing and SCBE's plan for homebound services for A.C. in October 2009. (D.E. 35, at 17–18.) Even so, this evidence is insufficient to overcome the legal presumption that Williams's acted in good faith.

SCBE states that Williams made the report because she believed she had a legal obligation to do so. As discussed above, Tennessee law requires school representatives to immediately report suspicions of abuse or neglect. TENN.CODE ANN. § 37-1-403. SCBE also maintains that only two weeks before making the DCS complaint, Williams attended a principals' meeting held by the SCBE superintendent concerning principals' duty to report suspected abuse and neglect. This meeting was held in response to criminal charges that were brought against a Memphis City School principal for failure to report. (D.E. 30–5, at 17.) At this meeting, a DVD was shown where Shelby County District Attorney Bill Gibbons instructs, "Do not attempt to investigate the incident yourself," and that, "It is not your duty to verify that the incident is true." (D.E. 30–5, at 18.) SCBE argues that Williams, confronted with evidence of suspected neglect, decided in good faith to report A.C.'s parents to DCS. The undisputed record supports her course of action.

In October 2008, Williams was confronted by A.C.'s first-grade teacher, Laura Richardson with suspicions of "medical

---

§ 37-1-410(a), which stated, "[a] person reporting harm shall be presumed to be acting in good faith and shall thereby be immune from any liability, civil or criminal, that otherwise be incurred or imposed for such action." *Bryant–Bruce*, 974 F.Supp. at 1139 (construing Tennessee's child abuse and neglect reporting statutes). However, this provision is strikingly similar to the current, amended language found in TENN.CODE ANN. § 37-1-410(a)(5).

**12.** Several of these acts are those which the court has already concluded are not retaliatory as a matter of law, see Part B.5 and B.6. While these acts, in and of themselves, do not provide the plaintiffs with actionable claims, the court finds that they are relevant to the issue of whether SCBE, and specifically Williams, harbored discriminatory intent.

802

abuse." (D.E. 30–4, at 11–12.) Richardson advised Williams that she wished to file a DCS report; however, Williams advised Ms. Richardson not to do so because the school was working on the relationship between the family and the school. (D.E. 30–4, at 14–15.) Nurse Brown also reported her concerns about A.C.'s fluctuating blood glucose levels to Williams on several occasions. (D.E. 30–5, at 4.) It was Nurse Brown's opinion, which she shared with Williams, that something must be wrong for the glucose levels to be so erratic. (D.E. 30–5, at 4.)

During the 2008–2009 school year, Carver, A.C.'s second-grade, pregnant teacher, was also concerned about A.C.'s blood glucose levels "skyrocket[ing] up and down." (D.E. 30–3, at 50.) Carver testified that, after monitoring A.C.'s glucose levels, she told her husband, a paramedic, about the fluctuation, and he responded that A.C.'s parents were "lucky that their little girl is still living." (D.E. 30–3, at 50–51.)

On October 30, 2009, at approximately 9:25 a.m., Carver notified Nurse Brown that A.C. was "feeling low." (D.E. 30–5, at 4.) Nurse Brown tested A.C. and found her glucose levels to be, in fact, low. (D.E. 30–5, at 4.) A.C.'s blood glucose level was found be at around approximately forty-eight. (D.E. 30–5, at 4.) Nurse Brown informed Carver that they were lucky that A.C. had not passed out. (D.E. 30–5, at 4–5.) Carver, stressed about A.C.'s levels, began to hyperventilate and became fearful that the stress would jeopardize her pregnancy. (D.E. 30–3, at 53.) She went to Williams's office. (D.E. 30–3, at 54.) At Williams's office, they took Carver's blood pressure, sat down with her, placed cold towels on her forehead and neck, and calmed her down. (D.E. 30–3, 54–55; D.E. 30–5, at 5.)

In response to this incident, Williams sent an email to Hargrave on October 30, 2011, documenting what had occurred.

(D.E. 36–13, at 2.) The email stated that Carver was concerned about A.C.'s roller coaster glucose levels. (D.E. 36–13, at 2.) The email also stated that Williams was "very concerned" about the health of the child and that she was ready to make a DCS report. (D.E. 36–13, at 2.)

Hargrave then contacted a DCS supervisor and described A.C.'s fluctuating glucose levels, without mentioning A.C.'s, J.C.'s, or B.C.'s names. (D.E. 30–5, at 18.) The DCS supervisor informed Hargrave that the school district employees were obligated to report this incident. (D.E. 30–5, at 18.) Hargrave informed Williams of her conversation with the DCS supervisor, and Williams made her DCS report. (D.E. 30–5, at 18; D.E. 35–7, at 50.) Based on these facts, Williams had a legitimate, good-faith reason for reporting A.C.'s parents to DCS.

The plaintiffs argue that Carver's testimony cannot be believed because she allegedly gave a conflicting account in her deposition and submitted an errata sheet. (D.E. 35, at 19–20.) The plaintiffs assert that Carver testified that nothing unusual happened on October 30, or that she even spoke with Williams on that day, but, in her errata sheet, Carver changed her testimony from nothing unusual happening to, "I hyperventilated." (D.E. 35, at 19–20.) The plaintiffs aver that this is a material alteration from which the jury can infer that this account was amplified or manufactured. But this is not a reasonable inference to draw from the record. The non-moving party must present more than a mere scintilla of evidence in support of their position; there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir.1993). On this, the plaintiffs have not met their burden.

Carver's deposition gives a complete recount of the events that occurred the day she hyperventilated. Carver's deposition reveals only that she could not remember exactly what day this event occurred. (D.E. 30–3, at 52–53.) Carver was candid about this fact. (D.E. 30–3, at 52–53.) Regardless, the court does not find this to be material because Williams and Nurse Brown both documented what occurred on October 30, 2009. (D.E. 36–13, at 2; D.E. 38–13, at 4.) The plaintiffs also offer nothing to refute Carver's testimony concerning the event. Instead of offering any actual proof, the plaintiffs merely state that Williams "invented a false story" and cite Carver's deposition where she testified that she could not remember the date on which she went to Williams's office. (D.E. 35, at 35.)

The plaintiffs also argue that Williams "lied" in the DCS report about the parents not testing their child at home. The plaintiffs aver that Williams's allegation that A.C.'s parents were not testing her glucose levels at home was "preposterous" because A.C.'s insulin pump tested her glucose levels every five minutes. (D.E. 35, at 22.) Thus, according to the plaintiffs, this shows that the DCS report was motivated by retaliatory animus.

In making this inferential leap, the plaintiffs aver that Nurse Brown, not Williams, *knew* that testing was occurring at home because Nurse Brown was trained on the insulin device and understood how to look back and see readings over time. (D.E. 35, at 22.) Therefore, Nurse Brown *"had to have known"* that the child was tested at home, but told Williams she wasn't anyway. (D.E. 35, at 22.)

Regardless of what Nurse Brown knew specifically about the glucose logs, the record shows that Nurse Brown was concerned about A.C.'s health, specifically her erratic glucose levels and voiced her concerns to Williams. The plaintiffs offer *no evidence* to show that Williams's reliance on Nurse Brown was improper. Nurse Brown testified that in her forty-two years as a nurse, she had never seen such erratic fluctuations. (D.E. 30–5, at 4.) Nurse Brown relayed these concerns to Williams on numerous occasions. Nurse Brown was also unable to contact A.C.'s endocrinologist to discuss A.C.'s fluctuations because J.C. specifically objected to school nurses contacting A.C.'s endocrinologist.

The plaintiffs do not dispute any of this evidence. Instead, the plaintiffs assert that fluctuating levels at school demonstrate that Nurse Brown and Williams lied about the C.s not testing their child at home. (D.E. 35, at 21–24.) But this is only conjecture. The plaintiff cannot defeat summary judgment by simply impugning the defendant's asserted justifications. *Warfield v. Lebanon Correctional Inst.*, 181 F.3d 723, 730 (6th Cir.1999). The plaintiffs must produce sufficient evidence from which the jury may find that SCBE acted in bad faith, and the plaintiffs have failed to do so. *Id.*

Most importantly, the plaintiffs do not dispute that Williams filed the complaint only after speaking with Hargrave, and only after Hargrave spoke with a DCS supervisor.[13] (D.E. 35–1, at 26–27.) The plaintiffs also do not dispute that Williams was motivated by the principals' meeting that reiterated a school administrator's legal obligation to report suspicions of abuse or neglect.[14] (D.E. 35–1, at 24–26.) The

13. Instead of disputing the facts, the plaintiffs lodge several hearsay objections. However, these statements are not hearsay because SCBE is offering Carver's, Nurse Brown's, Gibbons's, Hargrave's, and the DCS Supervisor's statements to show effect on the listener,

i.e., that they caused Williams to file her report with DCS.

14. The plaintiffs do argue that SCBE's reliance on the principals' meeting concerning

plaintiffs also do not dispute that A.C.'s first-grade teacher, Laura Richardson, pressed Williams to file a DCS complaint in the 2008–09 school year.[15] (D.E. 35–1, at 12.) Accordingly, the court finds that the plaintiffs cannot demonstrate that Williams's DCS report was not made in good faith. Thus, Williams's DCS report cannot be considered an adverse action as a matter of law. The plaintiffs fail to establish a prima facie case of retaliation.

Even if the plaintiffs had succeeding in establishing a prima facie case of retaliation, the plaintiffs could not prove pretext. SCBE's explanation for the DCS call provides SCBE with a legitimate, non-discriminatory reason for making the DCS call. And for the same reasons discussed by the court for determining whether SCBE made the report in good faith, the plaintiffs would be unable to show that SCBE's "asserted reasons had no basis in fact, the reasons did not in fact motivate the [adverse action], or, if they were factors in the decision, they were jointly insufficient to motivate the [adverse action]." *Sudekamp v. Fayette County Bd. of Educ.*, No. Civ.A. 04–467–JBC, 2005 WL 2137739, at *3 (E.D.Ky. Sept. 1, 2005) (quoting *Maddox v. Univ. of Tenn.*, 62 F.3d 843, 848 (6th Cir.1995)).

## III.  CONCLUSION

Based on the foregoing reasons, the court grants SCBE's motion for summary judgment. All of the plaintiffs' claims against SCBE are dismissed with prejudice.

---

the Memphis City School principal "is so grossly different that it suggests [SCBE] was *looking* for an excuse." (D.E. 35, at 33.) However, this is just an argument. The plaintiffs offer no facts to support that Williams's reliance on this meeting was improper.

15. On this point, the plaintiffs argue that Richardson's suspicions of abuse were a result of her ignorance of the nature of Type 1 diabetes. Richardson came to her conclusion because she saw A.C. at school with sweets on various occasions. While Richardson's opinion about A.C.'s diet may not be medically sound, as the plaintiffs point out in their response, it still does not refute the fact that Williams was influenced by Richardson's suspicions of abuse.